In re MARRIAGE OF LINDA RAE ASHBY, Petitioner-Appellee, and DANNY RAY ASHBY, Respondent-Appellant.

Fifth District No. 5—89—0009

Opinion filed January 8, 1990.

Gerald S. Reed, of Reed, Heller & Mansfield, of Murphysboro, for appellant.

Margaret J. Walsh, of Pessin, Baird, Belsheim & Wells, of Belleville, for appellee.

JUSTICE WELCH delivered the opinion of the court:

Respondent, Danny Ray Ashby (hereinafter referred to as father), appeals from an order of the circuit court of Randolph County, entered December 15, 1988, terminating his visitation rights with respect to his two-year-old daughter based upon a finding of sexual abuse. He raises three issues on appeal: (1) whether the trial court erred in allowing into evidence testimony concerning out-of-court statements allegedly made by the two-year-old daughter regarding father's alleged sexual abuse; (2) whether the trial court's finding that father had sexually abused daughter was an abuse of discretion and against the manifest weight of the evidence; and (3) whether the trial court's judgment terminating father's visitation rights was an abuse of discretion and against the manifest weight of the evidence.

The instant proceeding was initiated in the trial court by father who, on October 26, 1988, filed a petition for rule to show cause against Linda Rae Ashby, n/k/a Linda Weber, his ex-wife and the mother of the two-year-old daughter herein involved, alleging that she had contumaciously refused him the visitation rights granted him by a judgment for dissolution of marriage entered by the circuit court of Randolph County on December 21, 1987. Linda Rae Ashby (hereinaf-

ter referred to as mother) filed an answer to the petition for rule to show cause in which she admits that she refused father his visitation rights, but alleges that she did so for the reason that father is mentally and emotionally unfit to exercise visitation with daughter in that he has sexually abused the daughter during periods of his visitation. Mother also filed a counterpetition for modification of father's visitation rights alleging that daughter had been sexually abused by father while in his custody during his visitation, and that this environment seriously endangers her physical, mental, moral or emotional health. The petition prays that the court terminate father's visitation rights with the two-year-old daughter.

Because mother admitted denying father visitation with daughter, the cause came on for hearing on the counterpetition for modification on December 12, 1988. The following stipulation of the parties was entered into evidence: "That on August 15, 1988, [daughter] was examined by Dr. Henry at the SAM Clinic, Cardinal Glennon Hospital at St. Louis, Missouri, and that Dr. Henry would testify after examining [daughter's] vaginal and rectal area, it was her expert opinion that [daughter's] vaginal hymenal findings are consistent and suggestive of sexual abuse, in that she observed evidence consistent with trauma and/or penetration, and that the rectal findings also are suggestive of abuse/trauma in the rectal area."

Father was called to testify as an adverse witness. He testified that he resides with his parents; that he was divorced from mother on December 22, 1987, and that daughter was born on October 28, 1985. By the terms of the dissolution decree, father was granted visitation with daughter on alternate weekends, and on alternate Mondays from 8 a.m. to 8 p.m. Father believed that he separated from mother in February or March 1987. In January 1988, father left Illinois and moved to Florida, but returned to his parents' home in May 1988. During the four months he was in Florida, father had no visitation with his daughter. He visited with daughter on May 8, 1988. During that visitation, father and daughter were at father's parents' house and father's brother's house. Father was alone with daughter only in the car when he picked her up from her mother. Father has not seen his daughter since August 1988. Father denied ever touching daughter's genital area. During father's visitation weekends, daughter and father would sleep in the same bed. Daughter would sleep in Pampers and father would sleep in shorts.

Laurie Johnson testified that she is 28 years old and baby-sits for daughter. She has known daughter a little over 2½ years, and has baby-sat for her since February 1986, when daughter was only four

months old. She baby-sits for daughter four or five days a week from 8 a.m. until 4 p.m. She described daughter as very smart.

Prior to mother and father separating, Laurie testified that daughter seemed to be a very well-adjusted, happy child. After the separation, in mid-summer 1987, daughter began to change. Following her weekend visitations with father, daughter would "be a different child" for three or four days. She would be ornery and hateful and would sometimes appear to be in a daze. She would object to having her diaper changed, and would clench her legs together so that they had to be pried apart. Daughter's vaginal area would be a purplish-red color and would be sore. After three or four days, daughter would return to being a "nice, sweet little girl." However, after every visitation with her father, daughter would exhibit the strange behavior described above.

In July or August 1987, Laurie discussed daughter's strange behavior and physical symptoms with mother. Laurie was convinced that daughter was being sexually abused during her visitation periods with her father. In September 1987, Laurie and mother met with father's parents to discuss their suspicions. After that meeting, daughter would no longer return from visitation with a sore vaginal area and exhibiting strange behavior.

On May 9, 1988, the day after daughter's visitation with father upon his return from Florida, daughter was at Laurie Johnson's house. That afternoon, Laurie placed daughter down for a nap. Shortly thereafter, daughter woke up crying and came out to the family room where Laurie was. As soon as daughter saw Laurie, she stopped crying, laid down on the floor by Laurie's feet and went to sleep. A short while later, when Laurie had left the room, daughter woke up "hysterical and screaming." She ran outside looking for Laurie. Laurie picked her up and sat in a rocking chair with her while she cried. When daughter calmed down, she told Laurie that her father had "put candy down below," indicating her genital area, and that "he ate it out of there," and that her father had put candy on her feet and licked it off her toes. Daughter indicated that the candy was purple and that the incident had happened in a pink room or on a pink bed. Defense counsel objected to this testimony on the basis that it was hearsay. The trial court admitted the testimony under the spontaneous declaration exception to the hearsay rule.

In the first week of June 1988, Laurie's two children and daughter were in Laurie's family room. Laurie was in the living room. Laurie overheard daughter telling her children that father put candy "down here" and licks it out. Laurie did not know what prompted

daughter's statement. Again, defense counsel objected to the testimony as hearsay, but the trial court admitted it under the spontaneous declaration exception. Laurie testified that several times in the summer of 1988, when daughter returned from her father's, her vaginal area would be pink. On one occasion, daughter's vaginal area was puffy and pale or peaked. On one occasion, Laurie discovered purple candy near daughter's left nipple. Since daughter had stopped seeing her father in August 1988, she had returned to being a happy child. Laurie also recited that in 1987, daughter had gone through a period when she was afraid to take baths or go in the bathroom.

On cross-examination, Laurie admitted that in August 1987 she started asking daughter whether anyone had been touching her genital area. She asked daughter this question two or three times. Daughter stated that her father had "put his finger down there." Laurie stated that she never accused father to daughter; she merely asked if anyone was touching her. Laurie testified that on the morning of May 9, 1988, daughter did not appear upset or nervous. Daughter did seem more standoffish than usual. Laurie also testified that on May 9 daughter said that her cousin Mandy was present when father sexually abused her.

Mother Linda Rae Weber testified that in August 1987 she contacted the Illinois Department of Children and Family Services about her suspicion of father's sexual abuse of daughter. Beginning in July 1987, mother began to notice that daughter's vaginal area was very red when she returned from her father's, and that she was afraid to take a bath or have her diaper changed. On August 15, 1988, mother took daughter to Cardinal Glennon Children's Hospital for an examination to determine whether she had been sexually abused. On July 22, 1988, while mother was giving daughter a bath, daughter stated that her father put candy "in my other pee-pee hole and then he couldn't find it." Again, defense counsel objected on the ground of hearsay, but the court allowed the testimony under the spontaneous declaration exception. In the summer of 1987, mother began asking her daughter several times a month for two months whether anyone had been touching her genital area.

Mother's husband, Craig Weber, testified that on May 8, 1988, when daughter returned from her father's, she acted markedly different than she had in the morning. She stared blankly, almost as if she had been traumatized.

Mother rested her case on the cross-petition for modification, and the hearing was recessed until December 14, 1988. At that time, father testified that his bedroom at his parent's home is blue. He denied

ever having sexually molested or abused his daughter. He testified that when it came time for him to return his daughter to her mother, his daughter would become very upset. He has never had difficulty giving his daughter baths or changing her diapers. He testified that on occasion he had taken showers with his daughter as well as with both his daughter and her mother.

Daughter's cousin, Mandy, testified that she had never seen father commit any sexual acts upon daughter. Daughter usually cried and became upset when it was time for her to return to her mother's home after visitation.

Father's mother testified to the good relationship her son has with daughter. She testified that her bedroom has light pink curtains on the windows and her bedspread is "a coral salmon. It is not exactly pink." On several occasions, she noticed a rash on daughter, and daughter complained of pain when urinating. Daughter became upset when it was time for her to return to her mother's home after visiting with her father. Daughter never showed any fear or apprehension of her father.

Several witnesses testified to the good relationship between father and daughter, and that daughter cried and became upset whenever it was time for her to return to her mother's home after visitation with her father. That concluded the evidence. Closing argument was heard and the court rendered its ruling.

The court found that the spontaneous declarations of the daughter were very significant. The court also found that daughter had been sexually abused by father or while in his custody, and terminated father's visitation rights. The trial court's written order was filed December 15, 1988, finding that daughter was sexually abused by father during the times father was exercising his visitation rights, that allowing the father future visitation would seriously endanger the daughter's physical, mental, moral and emotional health, and that it was in the best interest of daughter to terminate father's visitation rights. Father's petition for rule to show cause was denied, and mother's counterpetition for modification of visitation was granted.

■ The first issue raised by father is whether the trial court erred in admitting into evidence, under the spontaneous declaration exception to the hearsay rule, testimony regarding daughter's out-of-court statements of sexual abuse by father. Courts have recognized a general liberalization of the spontaneous declaration exception in its application to the statements of children of tender years. (*In re Marriage of Theis* (1984), 121 Ill. App. 3d 1092, 1097, 460 N.E.2d 912, 916.) This is because, in child abuse cases, the eyewitness statement

of the child may be the only direct link between the child and the offender. Any other evidence is generally circumstantial physical evidence that indicates only that abuse was committed. Furthermore, a young child may be unwilling or unable to testify at trial. (*Theis*, 121 Ill. App. 3d at 1099, 460 N.E.2d at 917.) Thus, child abuse cases demand an even greater respect for the reliability of the child's statements, and the child's welfare is best served by a liberal interpretation of the spontaneous declaration exception to the hearsay rule in order to provide the fullest record possible concerning the alleged abuse. *Theis*, 121 Ill. App. 3d at 1099, 460 N.E.2d at 917.

Three factors must be present before a statement can come within the spontaneous declaration exception to the hearsay rule: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence. (*In re Marriage of Theis* (1984), 121 Ill. App. 3d 1092, 1097, 460 N.E.2d 912, 916.) As explained in *Theis*,

"the first factor, that the statement be spontaneous and unreflective, does not require that the event and the declaration be contemporaneous. The question is whether the circumstances exclude premeditation and design. [Citation.] If the statement occurs after the event, it can be considered 'spontaneous' where there is an indication that the stress created in the child by the event is still present at the time the statement is made. Under such circumstances, the stress activates the original sensations of the event in the memory of the child. Testimony that the child still appeared 'nervous' or 'distraught' and that there was a reasonable basis for continuing emotional upset will often suffice." 121 Ill. App. 3d at 1097, 460 N.E.2d at 916.

With respect to the second factor, absence of time to fabricate, *Theis* explains that it is the motivation of the declarant rather than the declarant's perception that is important. (121 Ill. App. 3d at 1098, 460 N.E.2d at 916.) The basic rationale for the admission of the out-of-court statement is that it is unlikely that a child of tender years will have any reason to fabricate stories of attack. *Theis*, 121 Ill. App. 3d at 1098, 460 N.E.2d at 916.

None of the three factors is singularly determinative. (*People v. Hatfield* (1987), 161 Ill. App. 3d 401, 409, 514 N.E.2d 572, 577.) Instead, courts employ a totality of the circumstances approach to determine whether a particular statement is reliable enough to be admissible. (*Hatfield*, 161 Ill. App. 3d at 409, 514 N.E.2d at 577.) Among the factors to be considered in making this determination are

whether there was opportunity for reflection and invention, the declarant's mental state at the time of the statement, the nature of the event, the influence of intervening occurrences, and the presence or absence of self-interest. (*People v. Merideth* (1987), 152 Ill. App. 3d 304, 316, 503 N.E.2d 1132, 1142.) The admissibility of spontaneous declarations should be determined on a case-by-case basis after considering all the relevant facts. (*Hatfield*, 161 Ill. App. 3d at 409, 514 N.E.2d at 577.) The general rule which has emerged from Illinois case law is that the statements of a nontestifying child-declarant to a witness identifying a person as having performed certain conduct which results in pain, or is stressful to the child-declarant, and made within a reasonable time of the complained-of conduct, meet the three-prong test of admissibility as spontaneous declarations. *Hatfield*, 161 Ill. App. 3d at 412, 514 N.E.2d at 578.

█ With regard to the first statement of May 9, father argues that it should not have been admitted because there was no evidence that a startling event occurred or of the length of time between the startling occurrence and the declaration. We disagree with father that there was no evidence of a startling occurrence. The parties stipulated to the statement of Dr. Henry of Cardinal Glennon Children's Hospital that daughter showed physical signs of sexual abuse. Furthermore, daughter's mother and baby-sitter testified to physical and emotional symptoms which indicated that some traumatic event had happened to daughter. Thus, there was evidence of a startling occurrence.

Father also argues that there is no positive evidence as to when this startling event occurred, or the time lapse between the startling occurrence and the daughter's declaration. He argues that without such evidence, the second factor, absence of time to fabricate, cannot be established. However, father had seen daughter on May 8, and her declaration was made on May 9. Prior to May 8, father had not seen daughter since January, several months prior to the declaration. The trial court concluded that the daughter was abused during her visitation with father on May 8. We cannot say that this conclusion is against the manifest weight of the evidence.

█ In any event, elapsed time is not a controlling factor in determining spontaneity. (*Merideth*, 152 Ill. App. 3d at 316, 503 N.E.2d at 1142.) Instead, the court must look at the totality of the circumstances to determine whether the child's statement is reliable. The question is whether the circumstances exclude premeditation and design. Regardless of the time lapse, the statement may be considered spontaneous where there is an indication that the stress created in

the child by the event is still present at the time the statement is made. *Theis*, 121 Ill. App. 3d at 1097, 460 N.E.2d at 916.

■■ Considering the totality of the circumstances in the instant case, we find several factors which indicate that the daughter's declaration of May 9 was sufficiently reliable to be admitted under the spontaneous declaration exception to the hearsay rule. At the time of the declaration, daughter was very distraught. She had awakened from a nap hysterical and crying. Her state of mind at the time of the declaration was such as to preclude fabrication. The nature of the startling event also precludes fabrication. Daughter was only two years old at the time of the declaration. It is highly unlikely that a two-year-old child could fabricate an incident of her father placing candy on her genital area and feet and licking it off. Such an occurrence is both peculiarly childish and peculiarly adult. It is not likely that a two-year-old child could fabricate such an event, nor is it likely that a two-year-old child could be "coached" to make such a statement while in an emotionally upset state. (See *In re Marriage of Theis* (1984), 121 Ill. App. 3d 1092, 460 N.E.2d 912.) Finally, daughter's statement that the abuse occurred in a pink room or on a pink bed was corroborated by father's mother's testimony that her bedroom had pink curtains and a coral salmon bedspread.

■■ Whether to admit an out-of-court statement into evidence as a spontaneous declaration is within the sound discretion of the trial court. (*People v. Fisher* (1988), 169 Ill. App. 3d 785, 789, 523 N.E.2d 368, 370.) We think that the child's declaration of May 9 is sufficiently reliable that the trial court did not abuse its discretion in admitting it into evidence as a spontaneous declaration.

■■ We find differently with respect to the second and third out-of-court declarations of the daughter. The second declaration was made the first week of June, and the third statement was made July 22, 1988. There is no evidence that daughter was nervous or distraught at the time she made the declarations, or that the stress created in the child by the event was still present at the time the declarations were made. At the times of the second and third statements, daughter had had time in which to reflect and fabricate the statements, and her motivations in making the statements differed substantially from her motivation in making the first declaration, when she was emotionally distraught.

We think that the second and third statements of daughter are similar to those made in *In re Marriage of Dunn* (1987), 155 Ill. App. 3d 247, 508 N.E.2d 250, where the appellate court found error in the trial court's admission as spontaneous declarations of statements of

sexual abuse made by a child to her grandmother, her kindergarten teacher and a therapist more than 10 months after the alleged abuse. The appellate court found that there was no indication that stress created in the child by the alleged event was present at the time she made the statements. None of the witnesses testified that the child appeared nervous, distraught or emotionally upset at the time she made the statements. The court contrasted the facts of *Dunn* with those of *Theis*, where the child was emotionally upset and crying at the time she made the declaration.

We think that the first declaration in the instant case is more akin to that made in *Theis*, while the second and third statements made in the instant case are more akin to those made in *Dunn*. Thus, we find that the trial court erred in admitting the second and third out-of-court statements of daughter into evidence under the spontaneous declaration exception to the hearsay rule. However, in light of the proper admission of the first spontaneous declaration, and the similarity between that declaration and the other two, we find that the admission of the second and third declarations was harmless error.

We turn now to the second issue raised by father: whether the trial court's finding that father had sexually abused daughter was an abuse of discretion and against the manifest weight of the evidence. Father does not not argue that the finding of sexual abuse is against the manifest weight of the evidence, but that the finding that he was the perpetrator of the sexual abuse is against the manifest weight of the evidence. Father argues again that the out-of-court declarations of daughter should not have been admitted into evidence, and that without these statements, there is no evidence to link the sexual abuse to father. We have already held that the first out-of-court declaration of daughter was properly admitted. This statement directly links father to the sexual abuse. There was also a great deal of circumstantial evidence linking father to the sexual abuse. Daughter's baby-sitter and mother testified that daughter exhibited strange behavior and suspicious physical symptoms upon returning from her visitation periods with her father. The strange behavior and symptoms disappeared when daughter had no contact with her father. Finally, there is absolutely no evidence pointing to anyone other than father as the perpetrator of the sexual abuse.

For a finding to be against the manifest weight of the evidence, an opposite conclusion must be clearly evident. (*In re J.H.* (1987), 153 Ill. App. 3d 616, 630, 505 N.E.2d 1360, 1369.) The trial court's finding that father had sexually abused his daughter is not against the manifest weight of the evidence.

The third issue raised by father is whether the trial court's termination of father's visitation rights was an abuse of discretion and against the manifest weight of the evidence. Most of father's argument goes to whether the evidence was sufficient to support a finding that father sexually abused daughter. We have already determined that it was. Thus, the question becomes, given the finding that father sexually abused his daughter during his visitation with her, did the trial court abuse its discretion in terminating father's visitation rights.

The Illinois Marriage and Dissolution of Marriage Act provides that a parent's visitation rights may not be restricted on a petition for modification unless the court finds that the visitation would endanger seriously the child's physical, mental, moral or emotional health. (Ill. Rev. Stat. 1987, ch. 40, par. 607(c).) This section states a strong public policy designed to preserve the relationship of parent and child, and the burden is on the parent seeking restriction of visitation rights to prove that the current visitation endangers the welfare of the child. (*In re Marriage of Blanchard* (1987), 162 Ill. App. 3d 202, 207, 514 N.E.2d 1208, 1211.) The endangerment standard in the statute is an onerous one. (*Blanchard*, 162 Ill. App. 3d at 207, 514 N.E.2d at 1211.) However, the matter of visitation privileges rests within the broad discretion of the trial court. *Blanchard*, 162 Ill. App. 3d at 207, 514 N.E.2d at 1211, quoting *Frail v. Frail* (1977), 54 Ill. App. 3d 1013, 1015, 370 N.E.2d 303, 304-05.

In the instant case, the trial court determined that sexual abuse of daughter by her father seriously endangered her physical, mental, moral and emotional health. This finding is not against the manifest weight of the evidence. Unlike other cases cited by father involving the question of termination of parental visitation rights (*Frail v. Frail* (1977), 54 Ill. App. 3d 1013, 370 N.E.2d 307 (mother incarcerated for murder of husband allowed visitation rights with minor children); *In re Marriage of Blanchard* (1987), 162 Ill. App. 3d 202, 514 N.E.2d 1208 (mother allowed visitation rights even though they were rarely exercised); *In re Marriage of Neat* (1981), 101 Ill. App. 3d 1046, 428 N.E.2d 1093 (mother allowed visitation rights despite hospitalization for mental illness)), the sexual abuse which occurred in the instant case involves a direct attack upon the child. Such an attack must seriously endanger the child's physical, mental, moral or emotional health, regardless of how otherwise healthy and close the relationship is between parent and child. Under such circumstances, termination of father's visitation rights was not an abuse of the trial court's discretion.

 Finally, father argues that the trial court could have taken a less drastic action than terminating visitation rights, such as allowing visitation under supervision. However, as we have said, the matter of visitation privileges rests within the broad discretion of the trial court. (*Frail v. Frail* (1977), 54 Ill. App. 3d 1013, 1015, 370 N.E.2d 303, 304.) Mother's petition for modification of visitation rights asked for the termination of father's visitation privileges; father did not seek any alternative or lesser disposition. The trial court did not abuse its discretion in terminating father's visitation privileges with his two-year-old daughter on the basis that sexual abuse committed by father on daughter during those visitation periods seriously endangered daughter's physical, mental, moral or emotional health.

For the foregoing reasons, the judgment of the circuit court of Randolph County is affirmed.

Affirmed.

HARRISON and GOLDENHERSH, JJ., concur.