*In re* MARRIAGE OF L.R., Petitioner-Appellant, and A.L.R., n/k/a A.L., Respondent-Appellee.

First District (5th Division)   Nos. 1—87—3554, 1—88—3118 cons.

Opinion filed July 27, 1990.—Rehearing denied September 27, 1990.

Kalcheim, Schatz & Berger, of Chicago, for appellant.

Catherine M. Ryan, of Ryan & Miller, P.C., of Chicago (Mary Ellen Dienes, of counsel), for appellee.

PRESIDING JUSTICE COCCIA delivered the opinion of the court:

I

Petitioner L.R. (father)[1] and respondent A.L. (mother) were married on December 19, 1981; H.R. (daughter), their only child, was born on August 1, 1982; their marriage was dissolved on June 29, 1984. Mother was granted custody of daughter, and father was granted reasonable visitation rights. This appeal arises from a dispute concerning his exercise of those rights. Specifically, father has appealed from an order entered by the circuit court, which abated his visitation with daughter, on the basis of a finding that he sexually abused her. He has also appealed from the circuit court's order directing him to pay mother's attorney fees. For the following reasons, we reverse the order abating visitation, reverse the order awarding attorney fees, and remand for further proceedings.

II

On November 11, 1985, mother filed a petition to abate father's visitation with daughter, alleging that he sexually abused her. Shortly thereafter, father filed a petition for a rule to show cause, seeking to enforce his visitation rights. A hearing began on June 22, 1987, and extended over the course of 10 days. For the purpose of clarity, we shall recite the relevant facts in the order in which events transpired, although the witnesses did not testify in that order. Parenthetically, we note that father's failure to file a table of contents for the voluminous record—contrary to Supreme Court Rule 342(a) (107 Ill. 2d R. 342(a))—did not assist us in resolving this appeal.

Mother testified that she had a conversation with daughter on October 29, 1985, in the kitchen of their home, around 7:30 p.m. No one else heard the conversation. According to mother:

"We were eating some kind of nuts, and [daughter] suddenly got off her high chair. She sat down on the floor spreading her legs, and she proceeded to take her clothes off. At that moment, I asked her, 'Why do you take your clothes off?' She said, 'I am going to show to you and tell you what my Papa

[1]In order to protect the identity of the parties' minor child, we shall not refer to family members by their full names.

does to me.' I said, 'Tell me. Do not take your clothes off.' She said he is asking her to sit on the cold bathroom floor with her legs spread out. Then, she stood up, came towards me with her back facing me, and she came between my legs. I was sitting on the chair. She bent herself down, and she show that he is putting something in her poopa (phonetic), and he does something in her pee-pee. Also, he was squeezing her legs when he was doing this. She said it hurt her, and she start[ed] crying, but he start pulling her hair, and she said the more she cried, the more he pulled her hair to prevent her from crying. She said she was calling, 'Mommy, Mommy, Mommy, but you didn't come.' *** I told [daughter], '[Daughter], I was too far for me to hear you calling me. That is why I couldn't hear you.' *** [Daughter] sort of finished the conversation by saying, 'Make sure that you will not do those things to me.' "

Mother then explained that daughter called her father "papa," that she called the rectum "poopa," and that she called the vagina "pee-pee."

Mother testified that she and daughter had another conversation later that same evening, about 9 p.m., in the bathroom. N.L. (sister), mother's child by a different marriage, was present for this conversation. According to mother:

"When I was giving her a bath, [daughter] said that when her Papa was putting something in her poopa, it hurt her very much, and 'I was calling you, and you didn't come.' And I explained to her that I was too far away from her. *** Then, she sat down on the edge of the bathtub, and she lifted one of her legs, and she showed that with her fingers, that Papa does something in her pee-pee like this."

Father's attorney objected to both statements on the grounds of the hearsay rule, and the circuit court reserved its ruling.

The day after hearing the alleged statements, mother took daughter to her pediatrician, Dr. Korach, for a previously scheduled appointment. Apparently, mother did not discuss these alleged incidents with Dr. Korach, and he did not give daughter a vaginal examination. Later that day, mother called a child abuse hotline. On November 1, 1985, she met with Marilyn Michaelparker of the Illinois Department of Children and Family Services (DCFS). Mother then took daughter to Mount Sinai Hospital, where she was examined by Dr. Joyce Smith. The next day, mother spoke with Detective Silverberg of the Skokie police department. According to the DCFS report, no criminal proceedings were initiated against father because the police believed that

daughter, who was three years old at the time, would not make a good witness.

On cross-examination, mother admitted that when daughter was making the supposed statements to her, the child was "sort of calm." Mother also conceded that she never returned to Mount Sinai to have daughter admitted for a more thorough examination, contrary to Dr. Smith's advice. Mother admitted that she secretly listened to father's telephone conversations with daughter, when he called the child. And mother conceded that her own mother, T.L. (maternal grandmother), told daughter that father did bad things to her.

Maternal grandmother testified through an interpreter, who was conversant in the Polish and Russian languages. According to maternal grandmother, she and daughter had a conversation in October of 1985, which was the child's first week of school. This conversation took place in maternal grandmother's home, after school. No one else was present. Daughter referred to two secrets, but she only told maternal grandmother one secret at that time. The first secret concerned father's negative statements about maternal grandmother, sister, and mother. Maternal grandmother testified that daughter told her the second secret during the last week of October 1985. Like the first conversation, the second conversation took place at her home, after school, with no one else present. According to maternal grandmother:

> "I asked her—[daughter], 'where do you want to talk, in which room?' She said in the bathroom. *** [Daughter] said not to tell—not to say anything and not to ask her questions. She wanted me to sit on the toilet seat. *** She started to take off all her clothes. *** Then, she sat on the naked floor. I asked [daughter], 'Why are you sitting on the naked floor naked?' [Daughter] said, 'I want to show you why I have been sick so often.' Once again, she said, 'Grandma, don't say anything. I will show you what was next.' She stood up from the floor, turned her back and said, 'Grandma, hug me closely.' She bent a little and showed me how Papa put a stick in her bottom. She started to cry. She said that while she was crying her Papa told her to stop crying and was pulling her hair. 'Grandma, it hurt a lot.' 'I didn't want him to do it. I asked him not to do it; but, he was still doing it.' *** Her father answered, 'A good father should do things like that, put a stick in your bottom.' *** She cried very much. She was white as a sheet of paper. She was cold as a piece of ice. She was hanging on her neck. She clang [*sic*] to her neck; and, she couldn't take her weight off her. I

didn't know what to do with her. I got scared and terrified." Maternal grandmother testified that daughter's supposed statements were made in Polish, with the exception of the word "Papa," which she said in Russian.

Counsel for father likewise objected to the admission of this testimony on the basis of the hearsay rule. Again, the circuit court reserved its ruling. On cross-examination, maternal grandmother conceded that daughter did not tell her when the alleged incidents occurred. She also admitted that her husband and their two sons were living with her at the time the supposed statements were made.

Iva Falevits also testified for mother. She was a friend of mother's, and daughter was her student at the time of the alleged statements. According to Falevits, daughter was shy and pensive around that time.

As noted above, Joyce Smith, M.D., examined daughter at Mount Sinai Hospital on November 1, 1985. Dr. Smith tested her for several sexually transmitted diseases, and those tests were negative. She found daughter's vagina to be normal, but found an abrasion in the lower part of the rectum. An abrasion, according to Dr. Smith, is a slight denuding of the skin, in which a layer of the skin is missing. In her opinion, the abrasion was secondary to significant trauma, of the sort children do not normally inflict upon themselves. Dr. Smith also opined that the trauma caused by the abrasion was consistent with the insertion of an object in the rectum. On cross-examination, Dr. Smith conceded that the abrasion could be consistent with other etiologies. That is, rubbing the rectal area, irritation, or scratching, or wiping a child too vigorously after a bowel movement could also produce an abrasion. Although daughter's condition was consistent with other etiologies, Dr. Smith could not rule out sexual abuse. She testified that such an abrasion takes one week to 10 days to heal. Although she had no idea as to what sort of object penetrated daughter's rectum, she believed there had been penetration by an object. There had not been full penetration, as the abrasion was located on the rectum's perimeter, the area dividing the internal and external parts. Finally, Dr. Smith confirmed that she recommended to mother that daughter be admitted to the hospital the following week for a complete in-patient evaluation, yet mother never returned with the child.

Marilyn Michaelparker was the DCFS investigator assigned to the case, as stated previously. Over father's objection, her official report was admitted into evidence. In her report, she concluded that father sexually abused daughter.

Psychologist Anne M. Brown, Ph.D., originally was appointed by the circuit court to investigate independently mother's allegations. However, she testified at the hearing as an expert witness for mother. In her report, dated February 18, 1986, Dr. Brown concluded that there was "no doubt" in her mind that daughter had been traumatized by a significant male, that the male in question was father, and that he sexually abused the child. Dr. Brown's conclusions were based upon the DCFS report; interviews with father, mother, and maternal grandmother; therapeutic evaluations of daughter; observations of daughter's interactions with mother and grandmother; phone conversations with daughter's teacher and a friend of maternal grandmother's; and the administration of a multiple-choice test to mother and father known as the Millon Clinical Multiaxial Inventory.

On cross-examination, Dr. Brown admitted that not observing father's interaction with daughter was a "flaw." Dr. Brown also conceded that never during her evaluations of daughter did she hear the child say that father sexually abused her. She admitted that parents have been known to make unfounded allegations of sexual abuse, that parents have brainwashed their children into making such allegations, and that children can be taught to fear their parents. In fact, Dr. Brown stated that approximately 40% of all abuse allegations made in Cook County are false. Dr. Brown admitted that her sessions with daughter did not reveal which male abused the child; instead, she made the inference that father abused daughter from other sources. Although Dr. Brown opined in her report that S.Z. (cousin), father's nephew, may also have abused daughter, she never interviewed cousin. She neglected to contact father's psychiatrist, even though this would have been a way for her to independently verify the allegations. Dr. Brown did not retain a Polish interpreter to translate what maternal grandmother was saying to daughter during the evaluations. Dr. Brown admitted that father told her he had trouble understanding the Millon test. And, when she gave the Millon test to mother and father, she had yet to receive formal training in its administration; indeed, she was not registered as a psychologist and licensed to practice in the State of Illinois until May of 1987, after her report was submitted to the circuit court.

Tina Grossman, a clinical social worker specializing in the area of child abuse, testified as an expert witness for father. Grossman criticized the methods which led Dr. Brown to her conclusion that father abused daughter. Grossman opined that Dr. Brown's methodology was biased in favor of mother. Based on Dr. Brown's data, Grossman did not believe that she or anyone else could say with a degree of cer-

tainty that father abused daughter.

Eric Ostrov, Ph.D., a forensic psychologist, also testified for father. Like Grossman, Dr. Ostrov opined that Dr. Brown was biased in favor of mother. He based his opinion on the facts that mother and father related different versions of what happened to daughter, but that Dr. Brown's data were drawn almost entirely from sources which favored mother. Dr. Ostrov stated that while literature in the field of child abuse places importance upon the observation of interaction between the alleged perpetrator of the abuse and the alleged victim, Dr. Brown failed to undertake such observation. Dr. Ostrov also criticized Dr. Brown's reliance on the Millon test. According to him, it is a clinical test, designed to assist in the diagnosis of persons who seek treatment for psychological problems; Dr. Brown should not have used it for her investigation, because she was not attempting to treat father. Dr. Ostrov also opined that the test should be used circumspectly on members of minority groups such as father, a Russian immigrant of Jewish extraction. Because the test was written in English, father's difficulties with that language could invalidate the test results. Dr. Ostrov likewise noted that even though daughter was given many opportunities to incriminate father in the course of Dr. Brown's evaluation, the child never asserted that father abused her. Dr. Ostrov opined that Dr. Brown's data, which consisted entirely of secondhand information, did not support her conclusions. And, assuming for argument's sake that daughter had been abused, Dr. Ostrov was of the opinion that there was nothing to confirm Dr. Brown's theory that the child had been abused by father.

Alan Ravitz, M.D., a child psychiatrist, testified for father. Dr. Ravitz also emphasized the importance of a perpetrator-victim interview in a case such as this. Dr. Ravitz stated that he would not have used the Millon test in the manner that Dr. Brown used it. Like Dr. Smith, Dr. Ravitz opined that daughter's rectal abrasion was consistent with other etiologies, including constipation, wiping the rectal area too vigorously after a bowel movement, irritation from rubbing the area, or poor hygiene. In response to questioning by the court, Dr. Ravitz opined that Dr. Brown's conclusion—that there was "no doubt" that father abused daughter—was not supported by her data; however, he admitted that her data did support the conclusion that it was more likely than not that such abuse occurred. But Dr. Ravitz criticized her data elsewhere in his testimony.

Father's mother, R.R. (paternal grandmother), testified in her son's behalf through a Russian interpreter. She lived with him at the time of the alleged incidents and noticed nothing unusual regarding

his relationship with daughter. Due to her poor health and advanced age she rarely left his apartment, where he brought the child for visitation. Paternal grandmother testified that she never saw father sexually abuse daughter. Whenever he had her over for visitation, paternal grandmother spent every moment with daughter.

Cousin, who is father's nephew, also testified. Like paternal grandmother, cousin lived with father at the time of the supposed abuse. Cousin saw daughter on every visitation, but he never saw father abuse her. Cousin also denied that he abused daughter. Cousin was with father, daughter, and paternal grandmother on every visitation because he was a student and studied at home. According to cousin, father never bathed daughter, although he did change her diapers and bring her to the bathroom when she was being toilet trained.

Finally, father testified. He denied sexually abusing daughter. Father testified that he never had overnight visitation with her, apart from a vacation in the summer of 1985. According to father, his last visitation with daughter was on October 26, 1985. She had a bowel movement in his bathroom, and he cleaned the loose stool from her rectum. On December 22, 1985, he had a telephone conversation with daughter. He testified that she told him that mother and maternal grandmother were telling her that he did something bad to her. However, father testified that daughter told him:

> "And she said, 'You did not do anything bad to me. That was a play. That was a joke.' And I felt that I can't go through all detail or the phone with my conversations, so I said, 'Yes, [daughter], it was a joke.' "

On cross-examination, mother's counsel asked father to explain what he thought the child meant by the word "joke." He stated:

> "I think that she meant that formerly when she had a nap at my apartment after that she would wake up, I would go to her bed, sit down on the side, and we will start to talk for approximately fifteen or twenty minutes. That was part of my educational process. And during this talk, I would play with her. I would tickle her, I would do all kinds of stuff that she will wake up in a happy mood. I will try to tell her stories. She would tell me stories that [sister] is calling her names, and she was asking me what to do with that. And I would say, 'Okay, [daughter], do not worry about it. If she is not right, you have to tell your mother that she is not right.['] That is what I understand she was saying that I was joking with her exactly."

Mother's explanation of what she thought the child meant by the word "joke" differs from father's explanation. Mother was permitted

to describe, over father's objection, an alleged incident that daughter supposedly related to her. According to mother:

> "She described—they were in the bathroom—behind the bathroom in the bathtub, and she was sitting on her father's lap, facing him. *** She was facing her father, and he told her to lift herself on her hands and relax; and, he started kissing her, and she said in her pee-pee and Papa was kissing her all over her body, and he was touching her all over her body; and, then some point he put his head under water and put some water in her nose also; and then he told her he's going to wash his underwear, and he was moving his hands between his legs up and down, and [daughter] said that whatever Papa was doing he told me that this is a joke."

The circuit court announced its decision on September 14, 1987. The court found that father abused daughter and abated his visitation until an expert determined that it should resume. Regarding the reserved rulings on father's hearsay objections to the admission of daughter's supposed statements to mother and maternal grandmother, the court ruled that the statements were admissible under the spontaneous declaration exception. The court went on to comment upon the remaining evidence. The court was impressed by what it described as mother's quick action when confronted by daughter's statements. The court found Falevits' testimony concerning the child's conduct at school to be probative. The court was persuaded by Dr. Smith's testimony. It interpreted Dr. Ravitz's testimony as a ratification of Dr. Brown's conclusions, rather than a criticism of them.

However, the circuit court acknowledged the weaknesses in mother's case. The court agreed with father's experts that Dr. Brown's failure to observe father with daughter was a "major omission." Nevertheless, on the basis of Dr. Brown's testimony, and that of the other witnesses, the circuit court agreed with her conclusion that father traumatized daughter. According to the court, the evidence clearly demonstrated that mother would prefer that daughter never see father again, and that mother would do whatever she could to achieve that goal. The court stated that it took this bias into account.

On October 9, 1987, the circuit court granted father's motion to reopen proofs. He submitted the report of a DCFS hearing held to consider his request that Michaelparker's report of child abuse be expunged from the State's records. After taking testimony on Michaelparker's methods, the DCFS hearing officer had concluded that the evidence was not sufficient to support a finding of child abuse, on the grounds that her investigation was not conducted in a thorough

manner. The DCFS director agreed with the hearing officer, and he ordered the report expunged.

Nonetheless, on October 26, 1987, the circuit court entered a written order, memorializing its oral ruling of September 14, 1987. This order provides in part:

"THE COURT FINDS:

1. That [father] has sexually abused the minor child [daughter].

2. That visitation of the minor child [daughter] by [father] at this time would seriously endanger [daughter]'s physical, mental, and emotional health."

Therefore, the court granted mother's petition to abate visitation, and it denied father's counterpetition for a rule to show cause.

Father appealed the order of October 26, 1987. He also appealed the circuit court's order of September 15, 1988, which directed him to pay mother's attorney fees in the sum of $9,500. We subsequently consolidated the appeals.

III

The dispositive issue before us concerns the circuit court's admission of daughter's alleged statements to mother and maternal grandmother under the spontaneous declaration exception to the hearsay rule. Father argues that the circuit court erred in admitting the supposed statements. He asserts that it is doubtful that the statements were ever made, since the only persons who testified to hearing them were mother and maternal grandmother, and since daughter refused to repeat the alleged statements to any neutral parties, although she was prompted to do so on many occasions. He also notes that there is nothing in the supposed statements to indicate when the alleged abuse occurred. Mother responds that the circuit court did not abuse its discretion in admitting the statements as spontaneous declarations. She points out that the rectal abrasion discovered by Dr. Smith on November 1, 1985, had a life of 7 to 10 days, that father saw daughter on October 26, 1985, and that her statements were made only days thereafter. The parties agree that the recently enacted statutory hearsay exception is inapplicable (see Ill. Rev. Stat. 1989, ch. 110, par. 8—2601), so we focus only upon the common law exception.

A statement relating to a startling event or condition, made while the declarant was under the stress or excitement caused by it, is admissible as a hearsay exception. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §803.3, at 624 (5th ed. 1990).) Traditionally, there are three requirements for admissibility under this ex-

ception: first, the occurrence of an event or condition sufficiently startling to produce a spontaneous and unreflecting statement; second, absence of time to fabricate; and, third, a statement relating to the circumstances of the occurrence. The exception is premised upon the notion that the excitement caused by the event or condition temporarily stills the capacity for reflection, thereby producing statements free of conscious fabrication. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §803.3, at 625 (5th ed. 1990).) In cases involving allegations of child sexual abuse, Illinois courts have employed a totality of the circumstances approach to determine whether a particular statement is reliable enough to be admissible. (See, *e.g., In re Marriage of Ashby* (1990), 193 Ill. App. 3d 366, 374, 549 N.E.2d 923, 927-28.) The admissibility of such statements should be determined upon a case-by-case basis, after considering all of the relevant facts. (*Ashby,* 193 Ill. App. 3d at 375, 549 N.E.2d at 928.) It must be remembered that the rule against hearsay—that witnesses may testify only as to facts within their personal knowledge and not as to what others tell them—is founded upon the necessity of the opportunity for cross-examination; it is a fundamental, rather than a technical, rule. *In re Marriage of Dunn* (1987), 155 Ill. App. 3d 247, 251, 508 N.E.2d 250, 253.

■ We must conclude that the circuit court abused its discretion in admitting daughter's supposed statements to mother and maternal grandmother as spontaneous declarations. We have considered the totality of the circumstances in determining whether the alleged statements are reliable enough to warrant an exception to the general rule against hearsay. This is a case pitting former spouses against each other, with the visitation rights to their child hanging in the balance. Courts must be cognizant of the incentive to perjury in cases where adults, who have an interest in the outcome of visitation or custody disputes, recite the hearsay statements of children. (See *In re Marriage of Gustafson* (1989), 187 Ill. App. 3d 551, 555-56, 543 N.E.2d 575, 578.) We must consider not only the nature of the action, but also the interests of the parties. As the circuit court found, the evidence clearly shows that mother does not want daughter to see father again, and that she will do anything to achieve that goal. The only other person who testified to hearing the child's supposed statements was maternal grandmother, mother's own mother, who also told daughter that her father did bad things to her. The child did not testify at the hearing, and the record reveals that she never repeated the alleged statements to anyone else, even though she was encouraged to do so during the course of Dr. Brown's investigation.

■ Other relevant facts do not support the admission of the alleged statements. As previously noted, the circuit court identified certain evidence as being probative when it announced its decision on September 14, 1987. For example, the circuit court was impressed by what it found to be the quick action mother took when confronted by daughter's alleged statements. However, there is nothing in the record to suggest that mother said anything about sexual abuse to daughter's pediatrician, when she took the child to him the very next day. And, shortly thereafter, mother refused to follow Dr. Smith's advice that she return with daughter to the hospital for a complete evaluation. The circuit court also placed importance upon the observations of Falevits, mother's friend, regarding daughter's shy and pensive behavior at the time the alleged statements were made. But the child was attending school for the first time in her life. The conclusion that a child has been sexually abused does not follow from the premise that she behaves shyly and pensively when beginning school, in the absence of additional circumstances.

The circuit court also rejected father's explanation of daughter's statements to him in their telephone conversation. However, the context of his remarks must be kept in mind. He was asked by mother's counsel to explain what he thought daughter, a three-year-old child, meant by the word "joke." It must be remembered that father—like mother—is not a native speaker of English, and it is not clear from the record whether his conversation with daughter was held in Russian, Polish, or English. Indeed, the record does not reveal whether daughter knew any English at all. This brings us to the other language problems presented by this appeal. For instance, the grandmothers both testified through interpreters: the maternal through a Polish interpreter, and the paternal through a Russian interpreter. The hearing transcript reveals that their testimony did not proceed smoothly. At least one translator had to be dismissed, and the proceedings were frequently interrupted by the parties, who suggested alternative translations. In any event, father's explanation of daughter's intentions is no less plausible than mother's.

Similarly, the expert testimony does not militate in favor of the supposed statements' admissibility. Dr. Smith, who testified for mother, was of the opinion that the abrasion on daughter's rectum was caused by penetration of an object, but she could not deny that it was consistent with other, innocent, etiologies. Dr. Ravitz, who testified for father, also opined that the abrasion was consistent with etiologies other than penetration. The circuit court was persuaded that Dr. Ravitz merely quarreled with Dr. Brown's conclusion that daughter

had undoubtedly been abused by father. The context of Dr. Ravitz's remarks, however, demonstrates that he was assuming for the purposes of the court's question that her methodology was proper; the rest of his testimony reveals that he rejected that hypothesis.

█ Finally, regarding Dr. Brown, the circuit court, as well as father's experts, agreed that her failure to observe the interaction between father and daughter cast doubt upon her conclusions. Moreover, the only person Dr. Brown interviewed who was not biased against father—apart from daughter—was father himself. Her reliance upon the Millon test is also questionable, given that she was inexperienced in its administration, that the test was designed for clinical rather than forensic purposes, and that father had difficulty with English. Last but not least, Michaelparker's DCFS report, which Dr. Brown relied upon in reaching her conclusions, was subsequently repudiated by the agency itself. We have, then, one incomplete investigation based upon another incomplete investigation.

Mother has cited several cases in support of the proposition that the circuit court properly made an exception to the hearsay rule. But the facts of those cases are not on all fours with the facts of our case. For instance, in *In re Marriage of Theis* (1984), 121 Ill. App. 3d 1092, 460 N.E.2d 912, the child's spontaneous declarations were repeated to a physician—a neutral party with no interest in the outcome of the visitation dispute. (Compare *Ashby*, 193 Ill. App. 3d 366, 549 N.E.2d 923 (appellate court upholds admission of baby sitter's hearsay testimony regarding minor child's statements as spontaneous declarations).) The criminal cases involving spontaneous declarations cited by mother are likewise readily distinguishable. In *People v. Cherry* (1980), 88 Ill. App. 3d 1048, 411 N.E.2d 61, the child's statements were related in the testimony of a neighbor and a police officer. In *People v. Watson* (1982), 107 Ill. App. 3d 691, 438 N.E.2d 453, two emergency room nurses related the child's spontaneous declarations. *People v. Chatman* (1982), 110 Ill. App. 3d 19, 441 N.E.2d 1292, was not a sexual abuse case. And *People v. Land* (1988), 178 Ill. App. 3d 251, 533 N.E.2d 57, was a sexual abuse prosecution in which the appellate court upheld the admission of the child's statements, through the mother, as spontaneous declarations; however, as the defendant in that case was not the child's father, visitation was not riding on the outcome.

█ In light of the foregoing facts and principles, we think that the supposed statements were too unreliable to justify an exception to the hearsay rule in this case. In other words, the alleged statements lack sufficient indicia of reliability to warrant application of the spon-

taneous declaration exception. Consequently, the order of October 26, 1987, granting mother's petition to abate visitation, and denying father's petition for a rule to show cause, must be reversed.

■■ ■ Although we have concluded that daughter's alleged statements should not have been admitted under the spontaneous declaration exception to the hearsay rule, the foregoing discussion demonstrates that those statements were not the only evidence of sexual abuse. Rather than weigh the remaining evidence ourselves, prudence dictates that we remand the case to the circuit court for another hearing.[2] The Illinois Marriage and Dissolution of Marriage Act provides:

> "(a) A parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger seriously the child's physical, mental, moral or emotional health. ***
>      ***
>
> (c) The court may modify an order granting or denying visitation rights whenever modification would serve the best interest of the child; but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the child's physical, mental, moral or emotional

---

[2]On remand, mother may seek admission of the alleged statements under the recently enacted statutory hearsay exception, mentioned above, which provides:

"(a) An out-of-court statement made by a child under the age of 13 describing any act of child abuse or any conduct involving an unlawful sexual act performed in the presence of, with, by, or on the declarant child, or testimony by such of an out-of-court statement made by such child that he or she complained of such acts to another, is admissible in any civil proceeding, if: (1) the court conducts a hearing outside the presence of the jury and finds that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and (2) the child either: (i) testifies at the proceeding; or (ii) is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement.

(b) If a statement is admitted pursuant to this Section, the court shall instruct the jury that it is for the jury to determine the weight and credibility to be given to the statement and that, in making its determination, it shall consider the age and maturity of the child, the nature of the statement, the circumstances under which the statement was made, and any other relevant factors.

(c) The proponent of the statement shall give the adverse party reasonable notice of an intention to offer the statement and the particulars of the statement." (Ill. Rev. Stat. 1989, ch. 110, par. 8—2601.)

This statute did not become effective until February 1, 1989, well after the hearing in the circuit court. Thus, although daughter did not testify below, there was no finding that she was unavailable as a witness. In the event daughter testifies on remand, of course, there need be no such finding.

health." Ill. Rev. Stat. 1985, ch. 40, pars. 607(a), (c).

■■■ ■■ On remand mother bears the burden of proving, by a preponderance of the evidence, that visitation by father would endanger daughter. (See *In re Marriage of Neat* (1981), 101 Ill. App. 3d 1046, 1048, 428 N.E.2d 1093, 1095.) The endangerment standard has been described as onerous, stringent, and rigorous. (See *Neat*, 101 Ill. App. 3d at 1048, 428 N.E.2d at 1095; see also *Ashby*, 193 Ill. App. 3d at 378, 549 N.E.2d at 930, and *Dunn*, 155 Ill. App. 3d at 254-55, 508 N.E.2d at 255-56.) The courts of this State have been reluctant to deny visitation rights because of the principle that parents have a natural or inherent right of access to their children, and because sound public policy encourages the maintenance of strong family relationships, even in post-divorce situations; only extreme circumstances allow courts to deprive a parent of visitation. See *Neat*, 101 Ill. App. 3d at 1048-49, 428 N.E.2d at 1096.

■■■ The plain language of section 607, however, reminds us that daughter's best interests must be considered. The parties seem to have lost sight of those interests, as evidenced by the fact that they refer to all family members by their full names in court documents, which are a matter of public record. Accordingly, we direct the circuit court to appoint a guardian *ad litem*, who is also an attorney, to represent her interests on remand. (See Ill. Rev. Stat. 1989, ch. 40, par. 506.) We further direct the circuit court to work with the parties and the guardian to establish a reasonable schedule of supervised visitation, until the proceedings on remand can be completed.

■■■ Finally, we come to the matter of attorney fees. The award of fees in mother's favor was predicated upon her success in persuading the circuit court to modify father's visitation rights. (See Ill. Rev. Stat. 1985, ch. 40, par. 508.) Since we are reversing the circuit court's decision, and remanding the case for further proceedings, the attorney fee award cannot stand. But after completion of the proceedings on remand, the parties are free to seek such fees again.

IV.

For the stated reasons, the circuit court's order abating father's visitation is reversed, the order directing him to pay mother's attorney fees is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded, with directions.

MURRAY and LORENZ, JJ., concur.