In re MARRIAGE OF BARBARA J. DIEHL, Petitioner-Appellant, and CARL D. DIEHL, Respondent-Appellee.

Second District   No. 2—90—1217

Opinion filed November 22, 1991.—Rehearing denied December 20, 1991.

Terry Fawell, of Fawell & Fawell, of Wheaton, and Barbara Heathfield, of Jill Metz & Associates, of Chicago (Jill Metz, of counsel), for appellant.

Joseph A. Olszowka, of Law Offices of William J. Stogsdill, Jr., of Wheaton, and Robert W. Burnett, Ltd., of Naperville (Robert W. Burnett, of counsel), for appellee.

Judith E. Fors, of National Center for Lesbian Rights, J. Cunyon Gordon and C. Steven Tomashefsky, both of Jenner & Block, and John Hammell, of Roger Baldwin Foundation of the ACLU of Illinois, all of Chicago, for *amici curiae*.

JUSTICE INGLIS delivered the opinion of the court:

This action involves a custody and visitation dispute between Barbara and Carl Diehl over their five-year-old daughter, Jenny. The trial court dissolved the marriage, divided the property, and awarded child support. At issue is the court's ruling that it was in Jenny's best interests to award custody to Carl and to restrict Barbara's visitation rights. Barbara appeals, contending that the decision was improperly based on the factual finding that she is involved in a lesbian relationship and, furthermore, that the decision was against the manifest weight of the evidence. We affirm the award of custody to Carl and modify the visitation.

Barbara and Carl Diehl were married in Illinois in August 1985. Coincidentally, both had five children each by previous marriages. Jenny, the parties' only child, was born on June 20, 1986. Barbara, 43 years old, filed for dissolution of the marriage and custody of Jenny on March 14, 1989. A two-day trial ensued in the spring of 1990 during which the trial court heard from 15 witnesses regarding the parties' character, their respective relationships with the child, and their respective abilities to care for the child. The following testimony was admitted into evidence.

### BARBARA'S TESTIMONY

Barbara testified that she is currently living in Oconomowoc, Wisconsin, and working as an assistant manager part time with the Milwaukee Journal. The family initially lived in Naperville, Illinois, and purchased a second home in East Troy, Wisconsin, in August 1986. After Jenny was born, Barbara worked part time for the Chicago Sun-Times from September 1986 to January 1987. To help with family expenses, Barbara secured part-time work in April 1987 in Milwaukee; the position required 30 to 35 hours per week and a daily commute from Naperville. She testified that she chose Milwaukee because Carl had told her that he would be retiring at the end of 1988, at which time the family would move permanently to Wisconsin.

From April to June 1987, Connie Irving baby-sat Jenny while the parents were at work. Barbara testified that she generally took Jenny to Connie's and picked her up.

In June 1987, the family moved to their East Troy, Wisconsin, home for the summer. Barbara continued working in Milwaukee. Barbara testified that Carl was not working that summer and that Jenny attended day-care. Barbara also testified that during the summer of 1987 she had primary responsibility for Jenny.

In September 1987, the family returned to their Naperville home. Barbara quit her position in Milwaukee and testified that until January 1988 she was again primarily responsible for Jenny's care. During January and February 1988, Barbara worked at a part-time job out of her house, and Jenny was with her.

Barbara formed a company with Peter Gould in Milwaukee in March 1988. She testified that she did so in anticipation of the family later moving to Wisconsin. Between March and June 1988, Barbara commuted between Naperville and Milwaukee on a daily basis. Barbara and Jenny spent the month of May at the East Troy home, and the whole family spent the summer there as well. Barbara testified that during the summer she was primarily responsible for Jenny's

care. She also testified that Carl was not working that summer and that Jenny attended day-care.

In September 1988, Carl returned to Naperville to his teaching position. From September through November 1988, Barbara and Jenny continued to reside at the East Troy home. During this period, Carl visited on Wednesdays and weekends. At the end of November, Barbara and Jenny moved back to Naperville when Carl was hospitalized for fainting spells. The family then spent a long Christmas and New Year holiday at the East Troy home.

In January 1989, Barbara started a new business with Jennifer Berger in Wisconsin, in anticipation of the family's permanent move there in June. Barbara testified that during January and part of February she commuted to Naperville, delivering and picking Jenny up at day-care each day.

Barbara began divorce proceedings in February 1989. Jenny stayed with Barbara at the East Troy home until March 1989. An agreed order was filed on April 6, 1989, under which Jenny spent 3½ days with Barbara in East Troy, and 3½ days with Carl in Naperville. Sometime after the divorce proceedings began, Barbara moved into another Wisconsin home which she rented.

Barbara testified that during the course of the divorce proceeding she obtained a protection order after an incident in which Carl hit and pushed her when she went to pick up Jenny from the Naperville home. Barbara testified that, in reaction to the weekly custody transfer, Jenny would cry and cling to her. Barbara further testified that on two occasions in April 1989 Carl failed to follow her directions as to medical care for Jenny.

Barbara now lives in Oconomowoc, Wisconsin, with Jennifer Berger. The two split living expenses equally. Barbara denied having a past or present lesbian relationship with Berger. She testified that she has a good relationship with her daughter and that their activities include visits to the zoo and museums, pumpkin and apple picking, visits with friends, boating, swimming and playing. Barbara testified that she believes that she would be the better custodial parent because she does not spoil Jenny, is more aware of Jenny's needs, has the ability to bring out the best in her daughter and takes Jenny to church on Sundays.

Regarding her life prior to her marriage to Carl in 1985, Barbara testified that she had been previously married. She had five children by that previous marriage, although she has not been in contact with them for 10 years. Barbara testified on cross-examination regarding her many different residences since her first divorce in 1976, includ-

ing stays in Indiana, Pennsylvania, Germany, Rockford, Chicago and Fox Lake. She also testified as to her many different types of employment over the same period.

BARBARA'S WITNESSES

Connie Irving testified that she baby-sat Jenny from September 1986 until May 1987, approximately 20 hours per week. Additionally, she would visit the Diehl family at their East Troy home. Irving testified that she observed Barbara's relationship with Jenny to be warm, fun, communicative and enjoyable. Irving testified that Carl's relationship with Jenny appeared to be less enjoyable than that of Barbara and Jenny's relationship. She observed that Carl would read and talk with Jenny but never seemed to be having fun with her.

Christina Lucas testified that she is the director of the Milwaukee day-care center that Jenny has attended on Thursdays and Fridays since 1989. Lucas sees Jenny for approximately 2½ hours each day. Lucas testified that Barbara and Jenny's relationship is open, happy and healthy. She also testified that Barbara participates in parent-child conferences.

Mary Jones, who lives next door to the Diehls' East Troy home, testified that she saw the Diehls almost daily during the summer and on weekends during the winter. She testified that Barbara is a very good mother and opined that Jenny enjoys being with Barbara. Jones further testified that Carl did not spend very much time with Jenny during the period of 1986 to 1989. She testified that Carl did build a sandbox for Jenny and occasionally took her for a walk in her stroller.

The next witness was Rae Redel, a 60-year-old close friend of Barbara's who lives in East Troy. Their relationship is such that Barbara calls her "mom," and Jenny calls her "grandma" and Redel's husband "grandpa." Redel saw Barbara and Jenny at least twice a week since she was born. Redel testified that Barbara and Jenny have a loving relationship. She also testified to a February 20, 1989, telephone conversation she had with Jenny. Redel testified that Jenny, who was at Carl's home in Naperville at the time, told her that "it's real bad here."

Dr. Robert Shapiro, a clinical psychologist was appointed by the court to investigate an allegation of sexual abuse by Carl to Jenny. Jennifer Berger reported that on February 25, 1990, Jenny was watching a television show that warned children about strangers or adults that would touch them in inappropriate places. Following the show, Jenny related to Berger that "Daddy still touches me on the butt and it hurts." Shapiro testified that he met with Jenny on March

9, 1990, and talked with her for about one hour. Shapiro determined that Carl had not sexually abused or mistreated Jenny. Shapiro wrote a three-page report, which was entered into evidence, containing his findings. His in-court testimony was identical to his written report in all major respects.

In the report, Dr. Shapiro wrote:

"As a result of my investigation I have found no evidence that Jennifer Diehl has been sexually abused or mistreated. However, there are some parental practices that exist that fall in the area of poor judgment and should be stopped."

He testified that, based on his observations of and discussions with Jenny during the hour long appointment, certain practices of Carl's should be stopped. Shapiro advised that Carl should let Jenny bathe in private and stop his practices of lying down with Jenny on her bed at bedtime. Shapiro also opined in his report that "it could be determined that Jennifer seems to have a closer relationship with her mother than she does her father." He cautioned, however, that his opinion "comes only from observing Jennifer with doll play and not from any direct experience of observing Jennifer with her parents."

Dr. Beth Huebner, a clinical psychologist, was appointed to this case in July 1989 through the Du Page County Conciliation Program. Through the course of her appointment, Huebner met with Carl twice, Barbara four times, Jenny and Carl once, Jenny and Barbara once, and Barbara and Carl together twice. Huebner reduced her findings in this case into two reports, although such reports are not contained in the record.

Based on her sessions with the parties, Huebner made several observations and recommendations. Huebner testified that she strongly recommended that Carl's practice of sleeping with Jenny while dressed in his undershorts be discontinued. She observed that Carl's temperament with Jenny appeared to be "somewhat depressed *** [h]is behavior was very slow, somewhat morose. He was somewhat impatient with Jennifer." Huebner recommended that Carl strap Jenny in her car seat whenever they travel, return Jenny home in a timely manner so that Jenny could receive Barbara's planned telephone call, and that Carl schedule Jenny for day-care several days a week.

Huebner staged a play therapy session in November 1989 that Carl, Barbara and Jenny attended. Both parents were seated at an equal distance from Jenny, who was given various play tasks and then prompted to invite a parent to help her. With each task, Huebner noted that Jenny invited Barbara to help her. However, on cross-ex-

amination, it was brought out that immediately prior to this session Barbara and Jenny had spent three days together. Huebner testified that such circumstances may or may not have had an effect on Jenny's actions that day. Huebner observed that, based on the play session, there was a "strong bonding" between Jenny and Barbara.

Huebner testified, that based on Carl's allegation, she asked Barbara whether she was a lesbian, to which Barbara responded that she was not. Huebner opined that Barbara had certain characteristics that put her stability as a parent in question. She noted that Barbara deserted her first family and had no contact with her parents for 10 years. She noted Barbara's work history as consisting of "a significant number of jobs, some of which were very short-lived." Huebner further testified that she spoke with three of Barbara's former employers. Huebner found that "Barbara had left several positions on very bad terms *** [and with] some of the jobs that she had left, there had been questions raised about ethical practices." On cross-examination, Huebner questioned whether Barbara would continue her relationship with Jenny, noting that although she loves Jenny dearly, many of Barbara's past relationships with family members were broken off by her. She also questioned whether Barbara could devote enough time to raising Jenny, noting that Barbara enjoys her work and works hard at it.

Huebner testified on cross-examination that she observed Carl interacting with Jenny, in the absence of Barbara, in a session on August 23, 1989. She testified that Jenny was responsive to Carl, that Carl was patient and that he set appropriate limits for her behavior. Huebner further testified that Carl had a very stable work history and that he had lived in the same community for a long period, although she was not sure how retirement would affect him. On cross-examination, Huebner testified that a divorce proceeding can bring about feelings of depression and anxiousness, of which she had testified that both parents had shown signs. Huebner testified that Carl had been the primary caretaker of Jenny during the period of the marriage that Barbara was commuting to Milwaukee. Huebner also noted that Carl had lied during one session concerning whether he had taken Jenny to a scheduled doctor's appointment.

Jennifer Berger, 29 years old, was the last witness to testify for Barbara. Berger testified that she met Barbara when they both worked for American Book Covers in July 1988. Berger testified that she and Barbara are close friends and have shared housing expenses 50/50 since March 1989. Berger stated that she and Barbara are not involved in a lesbian relationship. She testified that Barbara is respon-

sible for Jenny's care for the most part. On cross-examination, Berger testified that she assists in Jenny's care, including feeding her, playing with her, and putting her to bed. Berger testified that she has observed Barbara and Jenny engaging in a variety of activities including swimming, trips to the zoo and museums, parades, lunch with Santa and visits with friends.

On cross-examination, Berger testified that when she moved into the East Troy home in March 1989, she moved into Jenny's upstairs bedroom, across the hall from Barbara's room, and that Jenny moved downstairs to a smaller bedroom. On redirect, she explained that the bedroom switch was made because the upstairs bedroom was larger, and because the downstairs bedroom made it easier to get Jenny to go to sleep at night. Berger testified that she had never been to any of the gay bars where Karen Collerman, a business associate of Barbara's who had testified earlier in the proceeding for Carl, alleged that social and business meetings between Berger, Barbara and Collerman had taken place. And Berger testified that during a period of the temporary joint custody agreement she would transfer Jenny to Carl at the prearranged location while Barbara was waiting down the street.

### CARL'S TESTIMONY

Carl testified that he had worked at Elmwood School in Naperville for 29 years as a band instructor, retiring in June 1989. Carl currently works part time for Ellman's Music Store. Barbara was Carl's third wife. Carl had custody of and raised five children from a previous marriage, all of whom are now adults and not living at home. Carl keeps in contact with each of them and, in fact, recited each child's birthday on direct examination.

Carl's testimony regarding the dates of the moves of the family between Naperville and East Troy matched Barbara's testimony in all major respects. Carl testified that he was primarily responsible for Jenny's care during the periods of March through September 1987 and 1988. He testified that he was primarily responsible during the months of April and May of these two years because Barbara was commuting between Naperville and Milwaukee. When Carl is with Jenny, they play, go to the library and parks, take walks, play the piano and swim. Carl testified that he has a close and loving relationship with Jenny.

CARL'S WITNESSES

Barbara's first husband, James Kusbel, testified that he and Barbara were married from 1967 to 1977, during which time they had five children. Barbara was awarded custody of the children, but turned them all over to Kusbel four days later. Kusbel testified that he and Barbara have not spoken since 1977 and that Barbara has not seen or communicated with any of her five children since 1978.

Peter Gould, a former business partner with Barbara, testified that he and Barbara formed and operated American Book Covers from March 1988 through December 1988, at which time Barbara resigned. Gould fired Berger, who had been working for the company for about six months shortly thereafter. He testified that he and Barbara had a conversation in the summer of 1988 during which Barbara stated that she married Carl because he had a good income and because she wanted to have a baby. Gould testified that Barbara engaged in certain questionable business practices and that there were lawsuits pending between the two. In particular, Gould testified that Barbara had written $19,500 in company checks to herself, written $1,500 in checks to other employees that Barbara then endorsed, and incurred certain company bills that were not paid including a $1,100 car telephone bill and a $1,200 American Express bill. He also testified that Barbara removed certain company records without his permission. He testified that Barbara began National Academic Sales, a company in the same field of sales, shortly after she resigned from American Book Covers.

Karen Collerman was the next witness to testify. Collerman owns a printing business in Milwaukee and met Barbara when she was called upon to do some printing for Barbara's company in November 1989. Collerman testified that she saw Barbara and Jennifer Berger several times in November 1989 during the course of which Barbara and Berger admitted that they were lesbians. Collerman acknowledged that she was a lesbian. Collerman testified that she socialized with both women at certain gay bars in Milwaukee, observing them on one occasion holding hands and on another occasion with their arms around each other. She testified that both women presented themselves as a lesbian couple. In particular, Barbara gave Collerman a tour of her house in November 1989 at which time she referred to the upstairs master bedroom as "our room." She testified that Barbara had told her that the only obstacle to her obtaining custody of Jenny was the fact that she was gay. Collerman testified that she believes that Barbara cheated her out of money that was owed to her,

and for that reason she feels that Barbara is dishonest. Collerman further testified that in November and December 1989 she had multiple telephone conversations with Barbara during which Barbara indicated that she would pay the outstanding bills she owed to Collerman if Collerman would not testify at the custody proceeding.

Two of Carl's sons from his previous marriage, Kirk and Sheldon, testified. Kirk, a 31-year-old who is now married and living in Wichita, Kansas, testified first. Kirk testified that Carl was a very involved father during Kirk's childhood. Their activities together included the Boy Scouts, the YMCA, musical instruments, camping and travel. Kirk testified that after Carl's marriage to Barbara and after Jenny was born, he noticed that Carl did a majority of the child rearing and activities and housework. He stated that he observed his father changing Jenny's diapers, playing with her, giving her attention, bathing her and putting her to bed. Kirk testified that at a 1986 Christmas family gathering Barbara stated that she had been previously married but had not had any children. Kirk opined that Barbara is an "unstable person" and that Carl would be the more suitable custodial parent for Jenny.

Sheldon Diehl, 28 years old, also testified. He testified that between March 1988 and April 1988 he visited Carl and Barbara about three times a week. Sheldon testified that he observed Carl playing with Jenny, feeding, bathing and putting her to sleep. Sheldon further testified that during the summer of 1987 Carl was primarily responsible for Jenny's care.

The last witness to testify for Carl was Donald Barnickle, principal of Elmwood School in Naperville. Barnickle testified that he has known Carl for the 28 years that Carl has been a band instructor in the Naperville schools. He testified that Carl is a hard worker and has had an excellent attendance record. Barnickle opined that Carl's character was that of a kind, thoughtful and considerate person.

## TRIAL COURT'S DETERMINATION

At the conclusion of the testimony, and after summation by counsel, the trial court awarded custody of Jenny to Carl. The court also limited Barbara's visitation with Jenny to periods without Jennifer Berger, or any other female with whom Barbara is residing, being present. We quote at length the trial judge's oral opinion because the conclusions contained therein are at the heart of this appeal:

> "Probably the most important issue in this case, as presented by the attorneys and as acknowledged by the Court, is the issue of custody of Jennifer. That issue turns principally on this

Court—in this Court's opinion on the credibility not only of the parties but also the witnesses they presented.

*** I can and do find from the evidence that both parties have requisite parenting skills in order to rear Jennifer. The issue, however, is to which parent custody should be established based upon the standards set forth in Section 602.

If the petitioner and her witnesses were credible, then I think it would appear to this Court that the 602 standards would dictate to me that she, in fact, should be granted custody. I can make no such finding. In fact, I find that the petitioner and her witnesses that were presented were not credible.

What is recorded on the pages of this record do not reflect the entirety of what the Court observed. Mrs. Diehl appeared to be involved not in a contested custody case but an athletic contest where the only issue was winning.

Jennifer Berger when she testified looked constantly to Mrs. Diehl for approval of her answers. An obvious dependency exists between Mrs. Diehl and Jennifer Berger, and that is the opinion of this Court relative to its observance of the demeanor of the parties who testified and the witnesses.

Mrs. Diehl's responses at times were rapid-fire with a combative attitude that at times suggested, I got you on that one, now try again. I have to take all of those factors into consideration in determining the credibility of witnesses, and I have.

Since the parties' separation, Mrs. Diehl was—has not been the sole parenter of Jennifer. Miss Berger was always there, on visits, on vacations, on business trips. Their relationship is strong, and so strong that it's still—that they still both work together for the same employer at almost minimum wage.

Together they charge[d] Mr. Diehl with child abuse during the pendency of this litigation, a charge that was determined to be unfounded. It is noteworthy, and it should be noteworthy for this record, that it was Miss Berger's allegation that caused the investigation, a person who in this Court's opinion is emotionally and physically bonded to the petitioner and dependent upon the petitioner.

Dr. Huebner's fears that Mrs. Diehl will be an advocate for the sole purpose of advocacy I think is well founded and has been shown in this case.

The testimony *** of Miss Calone [sic] [Collerman] regarding the relationship of Mrs. Diehl and Miss Berger was credible

and convincing when taken with the entirety of the testimony as presented in this case.

Because of the strong relationship, Miss Berger will significantly affect Jennifer, and that is not [in] Jennifer's best interest in the opinion of this Court.

I further find that the relationship between Miss Berger and Mrs. Diehl will affect Mrs. Diehl's relationship with Jennifer.

I find that Mr. Diehl has good parenting skills, has been involved on a daily basis with Jennifer, and will provide a sound, safe, intellectual, and consistent environment for Jennifer. Accordingly, I find it is in the best interest to award custody of Jennifer to Mr. Diehl.

Mrs. Diehl shall be allowed visitation ***.

The visitation shall take place with a specific restriction, without Miss Berger being present or any other female with whom Miss Diehl may be residing until further order of this Court.

Because of Jennifer's tender years, I feel it is in her best interest not to be exposed to a lesbian relationship. When she is older and able to reasonably and logically make choices of her own and understand the differences in sexual preferences, the Court will consider removing the restriction on visitation."

A final judgment was filed on June 21, 1990. On July 21, 1990, Barbara filed a motion for modification and reconsideration. The trial court heard arguments on that motion on October 2, 1990, whereupon it denied the motion on that date. Barbara filed a notice of appeal on November 1, 1990.

Barbara asks this court to reverse the trial court's judgment on the two issues of custody and visitation. She argues that the trial court improperly applied section 602 of the Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1989, ch. 40, par. 602) by basing the custody decision on the court's factual finding that she was a lesbian. She argues that the resulting decision was manifestly unjust and against the great weight of the evidence. She further argues that the trial court engaged in unconstitutional sexual orientation discrimination in determining the custody matter. Barbara also argues that the trial court improperly restricted her visitation rights, since the court failed to make a finding of serious endangerment to the child which she argues is required under section 607(a) of the Act (Ill. Rev. Stat. 1989, ch. 40, par. 607(a)). She argues that the visitation restriction was also sexual orientation discrimination and thus unconstitutional. Lastly, Barbara argues that the order denying her custody and re-

stricting her visitation of Jenny violated her constitutional right to freedom of association.

Carl argues that the trial court's judgment should be affirmed as a proper application of the trial court's discretion under the Act. Carl contends that the trial court properly determined in accordance with the best interests of Jenny that he would be the more suitable custodial parent. He further contends that the trial court properly restricted Barbara's visitation with Jenny to periods outside the presence of Berger, Barbara's alleged lesbian partner.

We have granted the National Center for Lesbian Rights, the National Association of Social Workers, the American Civil Liberties Union Foundation, and the American Civil Liberties Union of Illinois leave to appeal as *amici curiae*. *Amici* argue that the trial court improperly based its custody and visitation decisions on the finding that Barbara was a lesbian.

## CUSTODY ANALYSIS

"One of the most difficult tasks of trial courts is determining which parent in a failed marriage will have custody of the children." (*In re Marriage of Wright* (1991), 212 Ill. App. 3d 392, 395.) The paramount consideration in making such a determination is the best interests of the child. *Wright*, 212 Ill. App. 3d at 395; *In re Marriage of Williams* (1990), 205 Ill. App. 3d 613, 619.

■ Section 602 of the Act governs custody proceedings and sets forth certain considerations for a court when it determines the best interests of the child:

"(a) The court shall determine custody in accordance with the best interest of the child. The court shall consider all relevant factors including:

(1) the wishes of the child's parent or parents as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school and community;

(5) the mental and physical health of all individuals involved;

(6) the physical violence or threat of physical violence by the child's potential custodian, whether directed against the child or directed against another person; and

(7) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child.

(b) The court shall not consider conduct of a present or proposed custodian that does not affect his relationship to the child.

(c) The court shall presume that the maximum involvement and cooperation of both parents regarding the physical, mental, moral, and emotional well-being of their child is in the best interest of the child. However, such presumption shall not be construed as a presumption that an order awarding joint custody is in the best interests of the child." (Ill. Rev. Stat. 1989, ch. 40, par. 602.)

The factors enumerated in section 602(a) are not an exclusive list of factors. (*In re Marriage of Fahy* (1991), 208 Ill. App. 3d 677, 688-90; *Williams*, 205 Ill. App. 3d at 619.) And the trial court is not required to make specific findings for each factor as long as the record reflects that evidence of the factors was considered by the trial court before making its decisions. *In re Marriage of Lombaer* (1990), 200 Ill. App. 3d 712, 723; *In re Marriage of Slavenas* (1985), 139 Ill. App. 3d 581, 585.

The trial court's determination of custody will not be disturbed upon review unless it is against the manifest weight of the evidence, manifestly unjust (*In re Marriage of Balzell* (1991), 207 Ill. App. 3d 310, 313; *Williams*, 205 Ill. App. 3d at 618) or there has been a clear abuse of discretion (*In re Marriage of Seymour* (1990), 206 Ill. App. 3d 506, 512). The reviewing court may consider the entire record before it. *In re Marriage of Edsey* (1990), 199 Ill. App. 3d 39, 56.

■ We initially note that there is a strong and compelling presumption that the trial court, the entity closest to the litigation, has made the proper custody decision. (*Wright*, 212 Ill. App. 3d at 395; *Balzell* (1991), 207 Ill. App. 3d at 314.) And, generally, a reviewing court will not disturb the trial court's determination of credibility because the trial court has a superior vantage point, which cannot be reproduced from the cold record, to observe and judge the witnesses' demeanor and credibility. (*Szesny v. Szesny* (1990), 197 Ill. App. 3d 966, 973; see *Williams*, 205 Ill. App. 3d at 619.) The trial court is therefore in a better position to evaluate the credibility, temperaments, personalities, and capabilities of both parents. *Balzell*, 207 Ill. App. 3d at 314.

Barbara characterizes the custody issue as whether it was error for the trial court to award Jenny to Carl solely based on Barbara's

alleged lesbianism. Barbara argues that her alleged lesbianism is not relevant to the custody proceeding, does not affect her relationship with Jenny, and therefore should not have been considered by the trial court pursuant to section 602(b) of the Act (Ill. Rev. Stat. 1989, ch. 40, par. 602(b)). We cannot agree with her characterization of the issue. Rather, we note that the trial court's reference to Barbara's alleged lesbianism was in the limited context of her cohabitation with Jennifer Berger. Thus, we find the issue to be whether a lesbian or homosexual cohabitation relationship of one of the parents in a custody action may be considered by the trial court as a relevant factor under section 602(a) of the Act (Ill. Rev. Stat. 1989, ch. 40, par. 602(a)).

■ Barbara and *amici* urge this court to apply the "clear nexus test," adopted by a minority of States, under which a parent's homosexuality should be an issue only insofar as there is a proven adverse impact on the child. (See, *e.g., In re Marriage of Cabalquinto* (1983), 100 Wash. 2d 325, 669 P.2d 886.) We believe that we can soundly decide this case based on present Illinois law, rather than by adopting and applying the clear nexus test. Our supreme court has held that when a trial court makes a child custody determination, "all of the circumstances must be considered that affect the best interests of the child." *In re Marriage of Thompson* (1983), 96 Ill. 2d 67, 78.

■ In *Thompson*, the supreme court clarified its position on what impact a parent cohabiting with another person other than his or her spouse would have on a child custody proceeding. Four years prior to *Thompson*, the court in *Jarrett v. Jarrett* (1979), 78 Ill. 2d 337, upheld a trial court's transfer of child custody to the father, where the mother was cohabiting with a man whom she had no present intention of marrying. (*Jarrett*, 78 Ill. 2d at 350.) In *Thompson*, the supreme court stated:

> "The *Jarrett* case does not establish a conclusive presumption that, because a custodial parent cohabits with a member of the opposite sex, the child is harmed. No such presumption exists in this State. The court in *Jarrett* indicated that a custody award is not arrived at by pressing one lever and mechanically denying custody to one parent." (*Thompson*, 96 Ill. 2d at 78.)

The court then went on to sustain the trial court's child custody award to the father, who was residing with a woman out of wedlock, because the evidence demonstrated "a healthy relationship *** between father and son and that [the son] was doing well in his father's custody." *Thompson*, 96 Ill. 2d at 79.

Barbara argues that the trial court here engaged in the kind of analysis that the *Thompson* court cautioned against, that of mechanically pressing a lever to deny Barbara custody of Jenny. While we believe that the trial judge may have better articulated his reasoning, we do not agree that he merely pressed a mechanical lever to reach his ultimate custody determination.

An intimate cohabitation relationship of a parent, be it heterosexual, homosexual or lesbian in nature, is a proper factor to be considered by the trial court in making a custody determination. (See *Thompson*, 96 Ill. 2d at 78-79; *Jarrett*, 78 Ill. 2d at 344-45; *Fahy*, 208 Ill. App. 3d at 688-90 (court assumed that mother's alleged involvement in a lesbian relationship bore some relevance to custody ruling and remanded cause for the trial court to determine the relevance and make an evidentiary ruling); *Williams*, 205 Ill. App. 3d at 618-20 (court affirmed award of child to father based in large part on mother's lesbian relationship with an 18-year-old who was undergoing counseling for sexual abuse and drug abuse).) Therefore, the trial court properly considered its factual finding that Barbara is involved in a cohabitation relationship with Jennifer Berger as a relevant consideration when it determined the custody issue.

■ Barbara and *amici* argue that the custody determination should be reversed because the trial court engaged in unconstitutional sexual orientation discrimination by considering Barbara's alleged lesbian relationship. We disagree. As we noted earlier, the *Jarrett* and *Thompson* cases stand for the proposition that a cohabitation relationship of a parent is a relevant factor to be considered by the court in making a custody determination. We find that proposition applicable to *any* cohabitation relationship. Contrary to the claimed discrimination, we believe that such an approach is sexual orientation neutral, in that *any* such relationship is considered to be a relevant factor regardless of the relationship's sexual orientation. We therefore find no merit in Barbara's arguments of unconstitutional discrimination.

Barbara and *amici* next argue that the custody determination should be reversed because the trial court's decision denied Barbara the constitutional guarantees of freedom of association and equal protection. We find these arguments to be without merit.

We first address the numerous sociological studies and reports that Barbara and *amici* have attached to and referred to in their briefs. The literature discusses the impact that homosexual parents have on their children. A large portion of their constitutional argument is based on these studies and reports, all of which were never offered into evidence at trial and, hence, could not have been consid-

ered by the trial judge, whose decision we are reviewing, or refuted at trial by Carl. Carl has not asked this court to strike the studies. We believe, however, that, in general, issues should be fully argued and litigated at trial (see *People v. Lutz* (1982), 103 Ill. App. 3d 976, 979-80) and this court should primarily engage in error correction (see 134 Ill. 2d R. 366(b)(1)). We are cognizant of the right of parties in an appeal to construct freely arguments based on relevant and persuasive authority (see 134 Ill. 2d R. 341(e)(7)) and the usefulness of secondary authority where needed. Having previously concluded that this court can plainly resolve the custody issue based on the primary and binding case law of this State, we need not place great weight on the numerous secondary authorities cited by Barbara and *amici*.

The freedom of association is a constitutional right which is included in the bundle of first amendment rights made applicable to the States by the due process clause of the fourteenth amendment. (*Tashjian v. Republican Party of Connecticut* (1986), 479 U.S. 208, 214, 93 L. Ed. 2d 514, 523, 107 S. Ct. 544, 548.) The freedom of association is not absolute and must yield to sufficiently important governmental interests if the means are closely drawn to avoid unnecessary abridgment of associational freedoms. (*Buckley v. Valeo* (1976), 424 U.S. 1, 26, 46 L. Ed. 2d 659, 692, 96 S. Ct. 612, 638; *Konigsberg v. State Bar of California* (1961), 366 U.S. 36, 49-51, 6 L. Ed. 2d 105, 115-17, 81 S. Ct. 997, 1006-07.) The governmental interest in any custody case is of great importance, that of insuring that children of failed marriages will be placed in the custody of the parent or other party who will best look after them. A permanent custody award to one parent will by definition leave the other parent without custody. And such a determination is governed by section 602 of the Act (Ill. Rev. Stat. 1989, ch. 40, par. 602), under which all relevant factors shall be considered. (*Thompson*, 96 Ill. 2d at 78-79.) Because a parent's associations are relevant to her ability to care for a child, we find that Barbara's freedom of association was not violated by the trial court's consideration of her sexual orientation.

The United States Constitution guarantees equal protection under the law for all; it guarantees that persons similarly situated shall be treated similarly. (*Rostker v. Goldberg* (1981), 453 U.S. 57, 79, 69 L. Ed. 2d 478, 495, 101 S. Ct. 2646, 2659; see *Lane v. Lane* (1975), 35 Ill. App. 3d 276, 281.) The Illinois Constitution provides similar protections. (Ill. Const. 1970, art. I, §2.) The equal protection clause provides an avenue for challenging governmental classifications that treat one group of persons as inferior or superior to others and for contending that general rules are being applied in an arbitrary or dis-

criminatory way. (*Jones v. Helms* (1981), 452 U.S. 412, 424-25, 69 L. Ed. 2d 118, 128-29, 101 S. Ct. 2434, 2442-43.) As we discussed previously, the law in Illinois that a trial court may consider a cohabitation relationship of a parent as a relevant factor in a custody proceeding applies equally regardless of the sexual orientation of the relationship. (*Thompson*, 96 Ill. 2d at 78-79; *Jarrett*, 78 Ill. 2d at 344-45; *Fahy*, 208 Ill. App. 3d at 688-90; *Williams*, 205 Ill. App. 3d at 618-20.) Therefore, we find that Barbara's constitutional guarantee of equal protection was not violated by the trial court's consideration of her sexual orientation.

■ Finally, Barbara argues that the trial court's determination that Carl should have custody of Jenny is against the manifest weight of the evidence. We disagree.

We have recited at length the testimony of the 15 witnesses at trial and the trial court's oral opinion, and we believe that a lengthy commentary on the evidence is not called for here. The record indicates that the trial court took into consideration all relevant factors under section 602(a) of the Act (Ill. Rev. Stat. 1989, ch. 40, par. 602(a)) in determining that the best interests of Jenny would be served by awarding custody to Carl. Our careful review of the record reveals that this was not a clear-cut case.

A similar situation was presented in *Wright* (212 Ill. App. 3d 392), where the court upheld a custody award to the father as not against the manifest weight of the evidence because the evidence clearly did not favor awarding the child to either the father or mother. (*Wright*, 212 Ill. App. 3d at 397; see also *In re Marriage of Pool* (1983), 118 Ill. App. 3d 1035, 1039 (court upheld award to father as not against the manifest weight when the evidence clearly favored neither the father nor the mother).) As in *Wright*, the evidence here did not clearly favor either parent. This was a bitterly fought divorce, with conflicting testimony and allegations of parental unfitness on each side. Therefore, we cannot say that the trial court's decision to grant Jenny's custody to Carl was against the manifest weight of the evidence.

### VISITATION ANALYSIS

■ A trial court's determination of visitation rights for the noncustodial parent is governed by section 607 of the Act. (Ill. Rev. Stat. 1989, ch. 40, par. 607.) Section 607(a) states the general rule:

> "(a) A parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger seriously the child's physi-

cal, mental, moral or emotional health." (Ill. Rev. Stat. 1989, ch. 40, par. 607(a).)

Section 607(c) provides the rule for requests to modify a pre-existing visitation order:

"(c) The court may modify an order granting or denying visitation rights whenever modification would serve the best interest of the child; but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the child's physical, mental, moral or emotional health." Ill. Rev. Stat. 1989, ch. 40, par. 607(c).

■■ The endangerment standard embodied in sections 607(a) and 607(c) has been described as onerous, stringent, and rigorous. (*In re Marriage of L.R.* (1990), 202 Ill. App. 3d 69, 85; see *In re Marriage of Anderson* (1985), 130 Ill. App. 3d 684, 688.) "The courts of this State have been reluctant to deny visitation rights because of the principle that parents have a natural or inherent right of access to their children, and because sound public policy encourages the maintenance of strong family relationships, even in post-divorce situations; only extreme circumstances allow courts to deprive a parent of visitation." (*L.R.*, 202 Ill. App. 3d at 85.) Therefore, liberal visitation is the rule; restricted visitation is the exception. (See *In re Marriage of Brophy* (1981), 96 Ill. App. 3d 1108, 1112.) And the custodial parent bears the burden of proving by a preponderance of the evidence that visitation with the noncustodial parent would seriously endanger the child. *Anderson*, 130 Ill. App. 3d at 688; *In re Marriage of Neat* (1981), 101 Ill. App. 3d 1046, 1048.

The trial court is vested with wide discretion in resolving visitation issues, and this court will not interfere with the lower court's determination unless an abuse of discretion occurred, or where manifest injustice has been done to the child or parent. *Anderson*, 130 Ill. App. 3d at 688.

■■ Barbara first argues that the trial court erred by restricting her visitation rights because the court applied the "best interests of the child" standard rather than the "serious endangerment" standard. We agree.

The June 21 order clearly restricted Barbara's visitation with Jenny. The court found in paragraph 7 of the order that:

"[B]ecause of JENNIFER's tender years it is in *her best interest* not to be exposed to a lesbian relationship, [the court] further finds that visitation shall take place without Jennifer Berger's being present or without any other female with whom BARBARA may be residing." (Emphasis added.)

The trial court erred in basing the restriction on the best interests standard rather than the serious endangerment standard.

We are aware that we could remand the case for the trial court to reconsider the evidence based on the serious endangerment standard. This court is of the opinion, however, that we can soundly conclude that Carl has not borne his burden of demonstrating the threat of serious endangerment necessary to restrict Barbara's visitation with her daughter. We also find the trial court's restriction unnecessarily broad in that it could apply if Barbara was, for example, residing with her grandmother. Consequently, we modify the visitation portion of the June 21, 1990, order by vacating paragraph 7 and the last sentence of paragraph B. The remaining visitation provisions, including those added by the trial court in the supplemental order of October 3, 1990, are affirmed.

Because we find the latter argument is dispositive of the visitation issue, we need not address the remaining constitutional arguments raised by Barbara or *amici*.

The judgment of the trial court is affirmed as modified.

Affirmed as modified.

WOODWARD and GEIGER, JJ., concur.