*In re* MARRIAGE OF BONNIE MAE IVEY, Petitioner and Counterrespondent-Appellee, and KERRY ALLEN IVEY, Respondent and Counterpetitioner-Appellant.

Fourth District No. 4—93—0854

Argued March 22, 1994.—Opinion filed April 21, 1994.—Rehearing denied May 23, 1994.

Frederick A. Bernardi (argued), of Pekin, for appellant.

Jerry Serritella (argued), of Peoria, for appellee.

JUSTICE LUND delivered the opinion of the court:

Respondent counterpetitioner Kerry Ivey appeals an order of the circuit court of Woodford County awarding him custody of the four children. He claims the extensive visitation rights granted to the mother eviscerate his award of custody. This visitation would occur at all times *except* alternate weekends and one evening per week between 4 and 9 p.m. The children would also be with their father on Sunday mornings, but the mother could request visitation one Sunday per month for church attendance. Kerry contends this visitation schedule violates the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1991, ch. 40, par. 101 *et seq.*). He also claims the order is against the manifest weight of the evidence and an abuse of the trial court's discretion. We reverse.

Bonnie and Kerry were married in 1981 and had four children born between 1983 and 1990. Kerry worked full time at Caterpillar, Inc., while Bonnie stayed home and cared for the children. In the summer of 1992, James Bridgeman was hired to work around the

house. Bonnie developed a relationship with Bridgeman and began having sex with him in the house three to five times per week while Kerry was at work. While this was occurring, two of the four children were in school and the other two were upstairs in their bedrooms. Later, Bridgeman moved out of the house he shared with his wife and moved into a trailer on the Ivey property.

On July 17, 1992, Bonnie, Bridgeman, and the four children left the Ivey residence and went to a motel in Galesburg, Illinois. Kerry was willing to allow the children to stay with him in the marital residence, but refused to give up the home to his wife. Bonnie and Bridgeman stayed one night in the motel room. The children slept on the floor in sleeping bags while Bonnie shared the bed with Bridgeman. In the morning, Bonnie and Bridgeman showered together while the children were still in the motel room. They spent the next three days at Bridgeman's brother's apartment and, again, shared a cot in the presence of the children, who slept on the floor.

On July 20, 1992, Bonnie filed her dissolution petition and a petition for order of protection. The trial judge issued an emergency order of protection giving Bonnie exclusive possession of the marital home and Kerry was removed from the house the following day. After an evidentiary hearing on cross-petitions for temporary relief, the trial court vacated the order of protection and awarded custody to Kerry. Under the order, Bonnie would babysit the children at the marital residence while Kerry was at work. The trial court also ordered that Bridgeman have no contact with the children and was not to enter the marital home at any time. Furthermore, he was not to operate the van temporarily awarded to Bonnie.

On February 19, 1993, the judgment of dissolution of marriage was filed deciding all matters except issues of custody, support, and visitation. On February 26, 1993, the trial court heard arguments on Kerry's motion to terminate the arrangement allowing Bonnie to babysit during the day at the marital residence. The trial court ordered that Kerry retain custody, but Bonnie's visitation would take place outside the marital home for 50% of the time on a week-to-week basis. It was also ordered that no child in either residence be exposed to the overnight presence of an unmarried person of the opposite sex. During the mother's visitation, she would be required to directly supervise the children. The father was required to hire a babysitter to directly supervise the children while he was not home.

The trial court then heard evidence on the custody issue. A great deal of time was spent presenting testimony regarding Kerry's alleged addiction to pornography. Evidence included one, possibly two, X-rated movies he kept in his attic and a number of Playboy

magazines. No evidence was presented that the children had ever been exposed to this material. Moreover, Bridgeman testified that he, too, has viewed pornographic material. Evidence presented on this issue amounts to little more than a transparent attempt to paint the father as a deviant for purposes of litigation.

The trial court's custody order remarked that the parties elected to make a significant issue of each other's past and present sexual appetites. The trial court found this issue diminished each party equally and offered little assistance to the court. We find the record fully justifies the trial court's assessment.

Despite the personal animosities in this case, both parties at various times stated that they found the other party a fit parent during their marriage. They understood the value of maintaining the children's relationship with both their parents. Evidence indicated that Bridgeman also got along well with the children.

Bonnie married Bridgeman and gave birth to his child during the course of the custody proceedings. They lived together in a three-bedroom trailer. She admitted that, in one respect, the Ivey residence was better for the kids because they each had their own bed and did not have to sleep on the floor. Furthermore, Kerry's house is bigger and has more room in which to play. Bonnie and Bridgeman planned to purchase a sofa bed soon for the two girls. If granted custody, they plan to get a different place and, eventually, build a new home. This is their second address since leaving Bridgeman's brother's apartment and is located in a different school district than the one in which the children were raised. Bonnie has not worked outside the home in approximately 12 years and is entirely dependent upon Bridgeman for her support. Bridgeman's income ranges between $20,000 and $27,000. He hoped to make between $25,000 and $30,000 in 1993 and expects his income to grow as his business develops.

Bridgeman was 35 years of age at the time of trial. He has been self-employed as a general contractor for the last 14 years. He has been married two times before and has two children from his first marriage, ages four and six. Although he has paid child support regularly for the last 6 to 10 months, he is currently $9,000 in arrears. Soon after these children were born in the State of Florida, the mother moved to Illinois while Bridgeman remained behind. Bridgeman had no contact with the children for between three and five years. Currently he is allowed supervised visitation until he can reestablish a relationship with them. Bridgeman was also adjudicated the father of another child, born out of wedlock in Florida. He has never paid any of the court-ordered support for this child, and he estimates an arrearage of $6,000 in this matter.

Bridgeman has two prior misdemeanor convictions for possession of marijuana; one in February 1992 and the other in April 1992. He has one outstanding warrant for his arrest in Florida for operating as an electrical contractor without a license. He contends he does not currently use drugs or alcohol. He claims he used marijuana off and on since 1975 or 1976, but stopped using it nine months before the custody hearing. This indicates he stopped using marijuana just prior to meeting Bonnie. Despite the fact that he had experienced a number of relapses since 1976, he claimed he had no need for professional treatment for drug problems.

Bridgeman also admitted using crack cocaine. At the temporary relief hearing on July 23, 1992, Bridgeman initially testified that he had never used crack cocaine. He later explained that he had used it but had "self rehabilitated" and had not smoked cocaine in over six weeks. Later, at the custody hearing, he stated that either the transcript had a misprint or he had made a mistake—he claimed he had not used cocaine for six months before that hearing. This testimony conflicts with the testimony of his ex-wife, who claims she last saw him use cocaine in April or May 1992, just a few months before he moved out of their house. He admitted that sometime in 1992 he went through a three-month period where he was spending a couple hundred dollars a week on cocaine. The drug expenditures caused him to write a number of bad checks. He also used cocaine while living in Florida.

Bridgeman's first wife testified that during their marriage from 1984 to 1986 he smoked a great deal of marijuana, used speed, and sometimes drank. At her request, he would sometimes stop using drugs for approximately one month at a time, but he always went back. He used drugs while the children were in the house and, on one occasion, his one-year-old daughter was found with a couple of his pills in her hand. Uncertain whether the child had eaten any of his drugs, she was forced to administer an emetic. She claims he merely shrugged it off when she discussed it with him. She also claims she saw him use marijuana with teenagers and had plants growing in his backyard in Florida. He would get high and drink on weekends. At these times, he became obnoxious and would pick fights. She described his behavior during these episodes as "psychotic."

Bridgeman's second wife, Rebecca Hughes, testified she was married to him for approximately three years. She claims he smoked marijuana every day, beginning about five minutes after getting out of bed in the morning and continuing throughout the day. He smoked crack cocaine, visited crack houses, and wiped out the bank account. She also claims he used drugs in front of his children during

visitation with them. Like his other ex-wife, she also described episodes of unusual behavior while he was using drugs. She claims he tried to choke her on one occasion because she would not give him money to buy more cocaine. On one occasion he pushed her through a screen door, and another time he tried to run her down with a car. The police had to be called on many of these occasions. She asked him a hundred times to enter a drug treatment center, but each time he refused.

Kerry testified he has worked for Caterpillar, Inc., for 21 years and makes a gross income of between $33,000 to $35,000 per year. His home has four bedrooms and is located in the country on 1.3 acres of land. The Ivey family had been a member of a local church, and he continues to attend this church with the children. He claims he does not drink and has never experimented with illegal drugs. He is active in community organizations and the activities of his children.

Kerry considers Bonnie to have been a good mother to the children up until she began her relationship with Bridgeman. He is concerned about his children's contact with Bridgeman, claiming he endangers their lives by his fast driving habits. He is also concerned about Bridgeman's drug addiction and the fact that he does not always keep his drugs away from children. In spite of the court's order that Bonnie directly supervise the children at all times, he claims she admitted to him that the children had been left alone with Bridgeman. As an example, he cites the fact that Bridgeman took one of the children to a work site for up to five hours at a time. On one of these occasions, a child was injured from stepping on a nail.

The babysitter Kerry employed was called as a witness in Bonnie's case. Bobbie Fisher testified she worked in the Ivey home for two months, beginning August 1992. She would start work at 4 p.m. and finish around 8 p.m. Her duties included making dinner, doing laundry, and cleaning up. She also occasionally helped with the kids' homework. During the first six weeks on the job, Kerry would come home and spend up to two hours in his room answering calls on his answering machine. This would occur approximately once a week. However, during her last two weeks on the job, Kerry spent a lot more time on the phone, only coming out of his room for supper. Afterward he would run errands or go to single parent meetings. He would spend only one night per week with the children during this time. She only saw Kerry help the children with their homework on two occasions and estimated he spent only 25% of his available time with the children. Later, she acknowledged that he spent a lot of his available time working around the house, doing upkeep and repairs.

She also understood that much of the time he spent in his room was devoted to matters related to the divorce. Bobbie testified that Kerry enjoyed a good, loving relationship with his children.

School teachers for the two eldest children testified in Bonnie's case. Kara, the second-oldest child, was described as doing unsatisfactory work as of January 1993, and it was recommended she get extra help from her parents. Kerry testified in June 1993 that Kara was doing excellent work now, receiving three A's out of five subjects. The teacher for Kelly, the oldest child, stated that she could benefit from more support from her parents in doing homework. Kelly was described as a "B" student and as being self-motivated. However, her teacher had observed she had social and emotional problems and is slow in forming friendships. Kelly had recently improved in her relations with other students and her teacher felt it would be hard for her to move to another school district. She thought it was important that Kelly have stability. She needs to make and keep a friend.

Since the custody decision was handed down, the children have been removed from the school they had been attending and have been placed in the Peoria school district corresponding to their mother's home.

Finally, Kelly testified outside the presence of her parents. She said she did not like living with her mom because she hits the kids and slaps them around. She said this often happens even when they do nothing wrong. She also claims Bonnie told her not to tell her father where she lived because he might try to kill her. Bonnie also allegedly told Kelly that Becky (probably Bridgeman's ex-wife Rebecca Hughes) was mean and might burn down their house. She claims Bonnie told her if the kids did not buy Bridgeman a Christmas present, she would slap them.

Kelly also claims Bonnie encouraged the children to shoplift, telling them to put candy in their pockets. On one occasion Bonnie was detained by store employees because one of the children was caught leaving the store with a toy guitar under his coat. Bonnie testified that she had taken the toy out of its box and allowed the child to play with it. She claims she had no idea he would try to leave the store without putting it back. Bonnie has one prior conviction for shoplifting from about 12 years ago. In regard to her daughter Kelly's description of her mother's excessive punishment, there is no evidence in the record to corroborate these statements. Kerry testified that Kelly does not get along well with her mother.

After dismissing the issues of the parties' sexual appetites and noting the severe personal animosities between them, the trial court's order stated:

"The Mother has demonstrated a serious deficiency by allowing her emotional attachment to Mr. Bridgeman to control her actions, and most important of all, exposed the children to situations and environments which were inappropriate and harmful to them. While I may be impressed with her forthrightness in admitting these activities, it does not diminish the serious lack of wisdom they display. I have serious concern that she may not always comply with conditions established by the Court when it is not in her interests (or those of Mr. Bridgeman) to do so.

On the other hand, the Father has not always made decisions based upon the best interests of the children. Further, it is unlikely that he will spend the substantial one-on-one time with these children that they need and will need in the future.

These children particularly require stability, and that is best provided in a locale where they have the regular support of both extended families which they can receive in this area. They need to be assured that the general area of their residence will remain constant. Guaranteeing them continued residence in this area is a major factor in this custody decision. I conclude that the history and conditions of the Mother's current husband present a potential danger to these children. Mr. Bridgeman and the Mother suggest that he no longer has a drug problem. That is wishful thinking at best. He is an addict who perhaps is in another period of abstention. He is neither a recovered nor a recovering addict. He is, in absence of appropriate and successful treatment, a time bomb which could explode in the Mother's household at any time.

I am convinced that these children need the consistency and stability which the Father can provide and the day-to-day attention the Mother can provide within the framework of that stability. I cannot control the animosity that these parents have displayed to each other and I anticipate it will continue. Only *they* [(emphasis in original)] can individually decide to remove the children from the emotional damage such attitudes produce.

Custody is awarded to the Father subject to extensive visitation. The visitation right shall include the right to make certain specified major decisions which are directly related to the visitation responsibilities. Counsel for the Mother suggests that if she has extensive responsibility to care for these children, she should receive child support; and counsel for the Father agrees that the Court has plenary authority to order support paid by a custodial parent. I agree with both.

The Mother's right of visitation shall occur at *all times except* [(emphasis in original)] for the following:

A. Alternate weekends from Saturday at 9:00 A.M. to Sunday at 7:30 P.M.

B. One evening each week for a period of from 30 minutes after school until 9:00 P.M. This day to be selected by the Father but to be the same day each week.

C. One four-week continuous period during the summer school vacation.

D. The evening hours of the day of each child's birthday (5:30 P.M. to 8:30 P.M.) and the same hours on the Father's birthday.

E. Father's Day.

F. Every Sunday from 8:00 A.M. to 12:30 P.M. However, if the Mother elects to do so, she may have visitation one Sunday per month for religious service attendance purposes at a church of her choice.

The Mother shall decide the location of the children's school attendance and shall determine who is to provide regular medical care. She is responsible for providing all necessary clothing and school-related expenses. Any elective medical care or serious non-emergency treatment will require the concurrence of the Father. The parents are required to allow the children to visit each set of grandparents, on their request, for a period of seven days each year.

Mr. Bridgeman is not permitted to be allowed to care for any of the children unless the Mother is also present. She may, however, arrange for temporary care of the children either by adult relatives, grandparents, or other reliable adults. No parent or step-parent is allowed to possess any unprescribed drug or illicit substance at their residence or at any time when a child is present nor be present with any child when under the influence of any such drug or substance. Neither parent may expose any child to any material which describes or portrays normal or aberrant human sexual intercourse or related activity unless in the context of institutional sex education."

Under the terms of this order, the noncustodial parent will have authority over the children's clothing, education, and medical care. Virtually no area of decisional authority has been allotted exclusively to the custodial parent. Perhaps most significant, over a typical 14-day period, the custodial parent will have contact with his children for only two full days, plus two evening sessions and Sunday morning for church.

A trial court may not create custody merely by calling it so. This order is not an award of custody, it is an award of visitation. Section 608(a) of the Act provides, in relevant part, that except "as otherwise ordered by the court, the custodian may determine the child's upbringing." (Ill. Rev. Stat. 1991, ch. 40, par. 608(a).) The statute obviously contemplates a certain flexibility in the trial court's custody

determination. However, this flexibility has limits. The custody order handed down in this case clearly and unequivocally awards authority for the children's upbringing to the noncustodial parent. We find no justification under the Act for this result.

Following arguments in respondent's post-trial motion, the trial judge remarked that if forced to decide which parent would receive undivided custody, he would have no choice but to decide in favor of the mother. As it stands now, the trial court's decision has already awarded *de facto* custody to the mother. We have carefully reviewed the record in this case and find this decision manifestly erroneous. Principal supervision of the children should not have been placed with the mother.

In marrying an individual with an extensive history of drug abuse, the mother created an unacceptably hazardous environment for the children. Evidence indicates Bridgeman has used drugs in the presence of children. Furthermore, his refusal to seek treatment for his condition lends credence to his portrayal in the trial court's order as "a time bomb which could explode in the mother's household at any time." The mother has already violated previous court orders prohibiting her from leaving any child alone with Bridgeman. The trial court's determination of custody will not be disturbed on review unless it is against the manifest weight of the evidence, manifestly unjust, or there has been a clear abuse of discretion. (*In re Marriage of Diehl* (1991), 221 Ill. App. 3d 410, 424, 582 N.E.2d 281, 290, *appeal denied* (1992), 144 Ill. 2d 632, 591 N.E.2d 20.) Under these facts, we question if there are any considerations weighing in favor of granting custody to the mother.

On remand, the trial court is ordered to award genuine custodial rights to the father. By this, we mean that the father shall be responsible for the principal supervision of the children and their upbringing. We recognize that the father will be required to hire a babysitter or nanny. This is not uncommon in today's world, where both parents often work full-time. The mother's visitation will be such that the children are not subject to the dangerous environment she has created.

Reversed and remanded.

KNECHT and GREEN, JJ., concur.