2026 IL App (2d) 250161-U
No. 2-25-0161
Order filed April 6, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

---

*In re* THE MARRIAGE OF RACHELLE M. WEISS,
f/k/a Rachelle M. Holtman, Petitioner-Appellant,

and

ROGER A. HOLTMAN, Respondent-Appellee.

Appeal from the Circuit Court of De Kalb County.
Honorable Stephanie P. Klein, Judge, Presiding.
No. 06-D-253

---

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Jorgensen and Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court did not err in granting a directed finding for respondent on the petition for contribution to their daughters' postsecondary educational expenses; Petitioner produced no evidence of the children's financial resources or what portion of their larger educational expenses, such as tuition and housing, petitioner actually paid.

¶ 2   In this postdecree proceeding, petitioner, Rachelle A. Weiss, f/k/a Rachelle A. Holtman, filed a petition for contribution against respondent, Roger A. Holtman, to order him to contribute to the college expenses of the parties' daughters, Cassandra and Jennifer Holtman, in accordance with. The trial court found that petitioner failed to establish a *prima facie* case for contribution

under section 513 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/513 (West 2022) and granted a directed finding (735 ILCS 5/2-1110 (West 2022)) in respondent's favor. Petitioner appeals, and for the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    The parties were married in 2000. On November 17, 2006, the trial court entered a judgment dissolving their marriage. The judgment incorporated a marital settlement agreement (MSA). At the time, Cassandra was five years old and Jennifer was one. Section VI[1] of the MSA addressed the payment of the children's postsecondary education expenses, which included but were not limited to "tuition, books, supplies, activity fees, registration fees, room and board." In pertinent part, section VI further stated:

"C. COURT DECIDES. The parties agree that the court shall decide the issue of the parental contribution for post-high school education, if there is any, and if the parents cannot agree, at the time each child pursues such education, using the appropriate statutory standard as it exists at that time.

D. PARENTAL OBIGATION LIMITED ***. Notwithstanding anything contained herein to the contrary, the parental obligation for educational expenses, if any[,] shall not exceed what is then being charged for educational expenses at Northern Illinois University [(NIU)] in DeKalb, Illinois. ***.

***

---

[1]Due to a clerical error, the MSA has two section VI's. We are concerned with the second section VI listed in the MSA.

F. CHILD'S OBLIGATION TO APPLY FOR LOANS, GRANTS, AND SCHOLARSHIPS. A child of the parties shall be obligated to, and the parents will cooperate in making application for, such governmental guaranteed loans, grants, or scholarships as may be available to the child."

¶ 5 On January 17, 2023, petitioner filed her petition, which alleged as follows. Cassandra and Jennifer had both graduated from high school and were pursuing opportunities for postsecondary education. Petitioner was already contributing to the children's postsecondary educational expenses, but respondent had contributed nothing. The parties had no agreement on paying for educational expenses. Thus, per section VI(C) of the MSA, the trial court should determine, under section 513 of the Act (750 ILCS 5/513), the parties' respective contributions to these expenses. In his response, dated February 24, 2023, respondent denied that he had "failed and refused" to contribute to the children's expenses. He alleged, rather, that his financial resources did not enable him to contribute to those expenses and that petitioner's financial resources far outweighed his.

¶ 6 On September 20, 2024, the trial court held a bench trial. Petitioner proceeded *pro se*. On petitioner's direct examination, the trial court admitted exhibits documenting both daughters' academic records. Petitioner also introduced tuition and expense statements from the universities the daughters attended. Relative to Cassandra, petitioner introduced a document from the University of Memphis entitled "Detailed Account Activity," showing tuition and various other charges for the fall term 2022, spring term 2023, summer term 2023, fall term 2023, and spring term 2024. The statement also showed credits, including loans, scholarships, and payments.

¶ 7 Relative to Jennifer, petitioner introduced, as Petitioner's exhibits Nos. 14 through 16, account statements from the University of Tennessee, Knoxville, for the fall term 2023, spring term 2024, and summer term 2024. These statements reflected tuition and other charges and also

showed credits, including scholarships, grants, and payments. Petitioner's exhibit No. 14 showed total charges of $14,414.12. Petitioner's exhibit No. 15 showed total charges of $14,165.72. Petitioner's exhibit No. 16 showed total charges of $1,542.84. Each statement was generated on September 6, 2024; as of that date, there was a balance of $1,027.

¶ 8 Also relative to Jennifer, petitioner introduced an "NIU Planning and Cost Estimator" dated May 21, 2024. The document contained a chart indicating that, for each of the fall 2024 and spring 2025 terms, the total cost of Jennifer's education as an engineering major would be $17,958.18, consisting of (1) tuition, general fees, and expenses totaling $11,387.18; and (2) room and board totaling $6,571. The combined cost for 2024-25 was $35,915.36. Beneath the chart was a section titled "Estimated Cost of Attendance," which indicated that the total expense for a 2024-25 full-time undergraduate would be $31,030.[2]

¶ 9 Petitioner then testified in narrative as follows. In January 2023, Cassandra began the spring semester of her junior year at the University of Memphis. She completed three full terms and a partial summer term before graduating in May 2024 with a business degree. Her expenses included $856.04 for a computer and between $435.83 and $459.18 per month for automobile insurance. In August 2023, Jennifer started attending the University of Tennessee, Knoxville's engineering school. She completed standard terms in fall 2023 and spring 2024 and a "mini term" in summer 2024.

¶ 10 Petitioner testified that, in October 2023, she made a $210 "down payment" for Jennifer's apartment. Petitioner paid $1,462 for Jennifer's "August 1st rent" and $1,515.08 for Jennifer's "September 1st rent." Petitioner paid $1,973.18 for a "mouse and engineering laptop" for Jennifer

---

[2]It is unclear what accounted for the disparity in the cost estimates.

- 4 -

and $310 for her on-campus parking. From mid-August through December 2023, petitioner paid various specified amounts for Jennifer's (1) off-campus meals, groceries, and gas; (2) lab equipment and other class necessities; and (3) miscellaneous educational charges. Petitioner identified these expenditures on the invoices and credit card statements she introduced into evidence. Petitioner also produced documentation that she paid $307.93 for four college applications and the ACT. However, these latter obligations were incurred no later than November 1, 2022 (well before the filing of the petition).

¶ 11 Petitioner also introduced, as petitioner's exhibit Nos. 87 through 97, statements from a First Horizon account held jointly by petitioner and Jennifer. These statements showed several deposits from "Cutco/Vector." Petitioner did not identify "Cutco/Vector" until the trial court granted the hearing on her motion to reconsider. *Infra* ¶ 34.

¶ 12 Petitioner testified next about her financial circumstances. She was the sole provider for Cassandra, Jennifer, and a third daughter with special needs. The family home was titled solely in petitioner's name, and she was paying the entire mortgage. She introduced documentation that she had a monthly mortgage payment of $1,829.63 and a monthly home equity line of credit payment of $1,487.19. She had a Venmo account with a balance due of $2,092.82, an Amazon account with a balance due of $6,053.58, a Target account with a balance due of $1,817.75, and a Citibank account with a balance due of $23,0918.28. She had withdrawn $45,000 from her 401(k) account to cover various expenses.

¶ 13 On cross-examination, petitioner's financial affidavit, dated January 12, 2024, was admitted into evidence. It stated the following. Petitioner's monthly gross income from all sources (she listed only her wages) was $15,007.76. Her total monthly payroll deductions were $3,116.98. Her total monthly living expenses, including mortgage ($1,077) and car payment, were

$15,680.87. Her health insurance expenses were $380 per month. Petitioner's monthly debt payments (exclusive of mortgage and car payment) totaled $1,736.69. Her assets included $6,336 in cash or cash equivalents; real estate with a fair market value of $429,900 and a balance due of $180,000; motor vehicles with a total fair market value of $22,051 and a total balance due of $4,062; a life insurance policy with a death benefit of $540,000 and zero cash value; four retirement accounts with a total fair market value of $515,858; and a nonfunctional car with a fair market value of $6,800. For tax year 2021, petitioner received a refund of $39,300; for tax year 2022, she owed $7,553.

¶ 14   Petitioner testified that her total retirement savings, as indicated in her financial affidavit, did not reflect a $45,000 withdrawal from a 401(k) account in July 2023. Otherwise, the affidavit was current.

¶ 15   Petitioner initially testified that Cassandra started school after January 17, 2023 (the petition's filing date), but petitioner later admitted that, on December 12, 2022, the University of Memphis issued a charge for tuition and books, with a due date of January 9, 2023 (the invoice was admitted into evidence). Asked how much she paid directly to the university for Cassandra's schooling for the spring 2023 term, petitioner testified, "I don't know an exact number." For the fall 2023 term, petitioner paid all of Cassandra's tuition, minus the approximately $2,000 she received in scholarships. As of the date of trial, Cassandra's school expenses were paid in full.

¶ 16   Respondent asked petitioner whether she was asking the trial court to order respondent to reimburse her for any payments she made to the University of Memphis for Cassandra's education. Petitioner replied that she was "not asking for any money for [herself]." Respondent then asked petitioner whether she was asking the trial court to reimburse her for any payments she made to the University of Tennessee, Knoxville, for Jennifer's education. She initially replied "Yes," but

after further interchange, she said, "No." She agreed with respondent that Jennifer's expenses at the university "ha[d] been paid *** all the way through this fall 2024 semester." Petitioner's testimony continued:

"Q. So are you just asking then that [respondent] contribute something toward college in the future semesters for [Jennifer]?

A. I wasn't, no."

After further interchange, petitioner said that she was indeed "asking for future costs."

¶ 17 At this point, the trial court interjected and asked petitioner to clarify what she was seeking. She replied:

"I was hoping to get $4,000 a semester per girl for their expenses starting January 2022 including their tuition fees per semester and then starting in the future I'm asking for $1,200 a month payable by myself and [respondent] to [Jennifer] to cover all her expenses."

¶ 18 Petitioner called respondent. He acknowledged that he had not yet contributed at all to the children's college expenses. Respondent's current yearly salary was approximately $72,000. He had no other income and was drawing no money from a pension he had with a former employer. Respondent was 58 years old; if he started drawing pension benefits at age 60, he would receive approximately $585 monthly. His 401(k) account with his current employer was worth approximately $42,000. To respondent's knowledge, he had no trust, rental, dividend, or interest income. Respondent did not know his current wife's income. They had separate bank accounts, but they shared monthly bills of $100 for gas for the home, $130 to $140 for electricity, and $100 for telephone service, all of which they paid out of a joint account.

¶ 19 The trial court admitted respondent's most recent financial affidavit, dated August 14, 2023. It stated as follows. Respondent's monthly gross income from all sources (he listed only his

wages) was $6,036.56. His total monthly payroll deductions were $1,220.50. He no longer paid child support. His total monthly living expenses, including mortgage ($1,723.94) and car payment, were $5,410.94. His monthly expenses also included $60 for his children's health insurance (his was employer-provided) and $1,287.67 for debt payment (exclusive of mortgage and car payment). His assets included $1,109.06 in cash and cash equivalents; $406,085.50 in retirement accounts, predominantly an Edward Jones account; real estate with a fair market value of $340,000 and a balance due of $201,500; vehicles with a combined fair market value of $63,000 and a combined balance due of $43,700; and two life insurance policies with combined death benefits of $125,000 and zero cash value. For tax year 2022, respondent received federal and state refunds totaling $2,410.

¶ 20    Respondent testified that, as of the date of trial, he "probably" had $120,000 to $130,000 of equity in his home. His mortgage payments were $1785 monthly. His checking account had a balance of about $900, and his savings account had a balance of about $600. His investment account with Edward Jones was worth approximately $400,000.

¶ 21    On cross-examination, respondent testified that the bursar's offices at his children's universities had denied his requests for information on their college expenses. Petitioner never told respondent what she paid in any semester for either child or what scholarships either child had received.

¶ 22    Petitioner called Cassandra. The trial court admitted copies of leases for apartments that listed Cassandra and her roommate as tenants for November 15, 2022, through October 31, 2023, and for December 1, 2023, through November 30, 2024. The leases were both unsigned. Cassandra testified that, of the monthly rents of $855 and $955 shown in the leases, her roommate paid $500, and she paid the balance plus utilities. She received a scholarship of between $2,000 and $3,000

from the University of Memphis each semester from January 17, 2023 (her first day of class), through May 2024, when she graduated. While enrolled, Cassandra incurred student loan debts. She paid her college expenses by working part-time. She has since paid off her student loan debt.

¶ 23 Petitioner rested. Respondent moved for a directed finding to deny petitioner any relief. He argued, "We have no idea what [petitioner] paid for either child's college expenses all the way up until today. We have no idea what the college expenses are going to be for January moving forward."

¶ 24 Petitioner responded that she had introduced ample evidence of her children's college expenses—for instance, petitioner's exhibits Nos. 14 through 16, the account statements from the University of Tennessee, Knoxville. When the trial court asked petitioner what relief she sought, she replied that she wanted lump payments directly to Cassandra ($15,385) and Jennifer ($17,128.64) for expenses paid, plus biweekly payments directly to Jennifer for future expenses.

¶ 25 Respondent replied that Cassandra had testified that all her educational expenses had been paid; he reiterated that there was "no evidence of what was actually paid."

¶ 26 In ruling on respondent's motion, the trial court began with the pertinent statute, section 513 of the Act. As pertinent here, it reads:

> "(a) The court may award sums of money out of the property and income of either or both parties *** as equity may require, for the educational expenses of any child of the parties. ***.
>
>            * * *
>
> (d) Educational expenses may include, but shall not be limited to, the following:
>
> > (1) except for good cause shown, the actual cost of the child's post-secondary expenses, including tuition and fees, provided that the cost for tuition

and fees does not exceed the amount of in-state tuition and fees paid by a student at the University of Illinois at Urbana-Champaign for the same academic year;

(2) except for good cause shown, the actual costs of the child's housing expenses, whether on-campus or off-campus, provided that the housing expenses do not exceed the cost for the same academic year of a double-occupancy student room, with a standard meal plan, in a residence hall operated by the University of Illinois at Urbana-Champaign;

(3) the actual cost of the child's medical expenses, including medical insurance, and dental expenses;

(4) the reasonable living expenses of the child during the academic year and periods of recess;

(A) if the child is a resident student attending a post-secondary educational program; or

***

(5) the cost of books and other supplies necessary to attend college.

* * *

(j) In making awards under this Section, or pursuant to a petition or motion to decrease, modify, or terminate any such award, the court shall consider all relevant factors that appear reasonable and necessary, including:

(1) The present and future financial resources of both parties to meet their needs, including, but not limited to, savings for retirement.

(2) The standard of living the child would have enjoyed had the marriage not been dissolved.

(3) The financial resources of the child.

(4) The child's academic performance.

(k) The establishment of an obligation to pay under this Section is retroactive only to the date of filing a petition. The right to enforce a prior obligation to pay may be enforced either before or after the obligation is incurred." 750 ILCS 5/513 (West 2022).

¶ 27 The trial court noted that petitioner "[bore] the burden of proof of establishing at this point in the proceedings at least sufficient evidence of all of the elements for the case to move forward." The court then addressed the expenses listed in subsection (d) and the factor identified in subsection (j)(1): the parties' financial resources:

"I will start first in looking at what the statute says, and it starts with talking about the cost of tuition and that the tuition—there's a cap in the statute as to the amount of tuition as well as to the amount of housing expenses.

I haven't received any evidence as to where these—even if I were to assume that these reflected actual expenses[,] where they fall with regards to the statutory cap, but even leaving that aside, again, I've heard evidence about [petitioner's] financial resources. I have heard some evidence about [respondent's] financial resources. ***."

¶ 28 As to the subsection (j)(2) factor (the standard of living that the children would have enjoyed had the marriage not been dissolved), the trial court stated, "I have heard evidence about, again, their financial situations that I think would probably play into that." The court then addressed the subsection (j)(3) factor (financial resources of the children):

"I have not heard any evidence about the financial resources of either child. Cassandra testified. She testified first that she was a full-time student. Then it came out later, which I

don't doubt that she did take a full load of classes, but it came out later that she actually was also working.

I don't know what she earned. I don't know how much she worked. I don't know if she had other financial resources. She had a scholarship of undetermined amount for an undetermined length.

I don't have any information about Jennifer's employment, financial resources.

So I do not have sufficient evidence on factor 3. ***."

¶ 29 Petitioner stated that she had documented Jennifer's expenses and scholarships, but the trial court responded that it had no information about Jennifer's financial resources. The court concluded:

"I do not find that [petitioner has] sustained [her] burden of proof to move past directed [*sic*]. I am going to grant the motion for directed finding.

I will also say this. Even if I were to find that [petitioner] did, [her] income is almost three times [respondent's] income. [Petitioner has] over twice as much equity in [her] home as he has."

¶ 30 Petitioner, now represented by counsel, moved to reconsider the directed finding. She argued that, "through testimony and numerous exhibits, [she] provided the [trial] court with sufficient evidence of the adult children's expenses to prove her [p]etition *** by a preponderance of the evidence." She also claimed that the court disregarded information (which she did not specify) in respondent's financial affidavit that related to his ability to contribute to the children's college expenses. Finally, she argued that the court failed to recognize that section IV(C) of the MSA obligated both parents to contribute to the children's college expenses.

¶ 31    The trial court held a hearing on petitioner's motion to reconsider. Petitioner argued that the court had overstated the discrepancy in the parties' financial resources. She maintained that the difference in the values of their retirement accounts was not very significant when the value of petitioner's 401(k) was adjusted by the $45,000 she had withdrawn. Also, respondent's financial affidavit did not include the $585 monthly pension payment to which he testified. Finally, the disparity in the parties' equity in their respective homes was not as great as the court had stated, given that petitioner's financial affidavit disclosed "that debt of the $112,680."[3] Petitioner thus suggested that "there was some additional debt that [petitioner] had that maybe wasn't taken into account."

¶ 32    Respondent argued that the basis of the directed finding in his favor was that petitioner had produced no evidence on the section 513(j)(3) factor, the financial resources of the children. Further, petitioner "never told us what was actually paid for either of the children." Finally, petitioner had testified that she wanted reimbursement for college expenses incurred before January 17, 2023, which the Act does not allow. See 750 ILCS 5/513(k) (West 2022) ("The establishment of an obligation to pay under this Section is retroactive only to the date of filing a petition.").

¶ 33    Petitioner replied that the trial court had heard evidence of Jennifer's income, *i.e.*, the First Horizon bank statements, which petitioner claimed showed deposits of Jennifer's wages from her job with "Cutco/Vector." Petitioner conceded that there were no bank statements indicating Cassandra's income and that the testimony about Cassandra's employment and her wages was "not specific." The court then asked petitioner whether there had been "any testimony about [Jennifer's]

---

[3]It is unclear which debt petitioner was referencing here.

ability to earn income" or about "financial support she might have had that [was not] contained in those seven months of bank statements." Petitioner responded that, because Jennifer did not testify, any such further information would have been from petitioner. Petitioner conceded that the only evidence introduced as to Cassandra's financial resources was that Cassandra worked part-time, but that there "wasn't anything specific."

¶ 34    The trial court then asked petitioner what the evidence "establish[ed] Jennifer's actual post-secondary expenses to be." Petitioner responded that "[Jennifer] had a one-time payment of $17,128.64" in tuition and fees. When asked what testimony supported that assertion, petitioner pointed not to *testimony*, but to her *request* (during argument on the motion for a directed finding) that Jennifer be awarded a lump sum of $17,128.64. When the court asked "how *** that establish[ed] *** Jennifer's actual college expenses," petitioner replied that "given time to go through the exhibits, [she] could pull out the exhibits that coincide with the expenses." As for Cassandra, petitioner noted that she had previously requested $15,385 toward Cassandra's expenses, "based on exhibits that were introduced into evidence." Petitioner stated, "[I]f it would help the [c]ourt, we could file a supplemental memorandum going through the exhibits, itemizing the amounts, [and] reconciling them with what [petitioner] asked for in the closing argument." The court did not comment on this offer, but said:

> "I don't know how you get past the fact that there was no evidence presented regarding the financial resources of [Cassandra], and that that presented regarding Jennifer is certainly not comprehensive. It does not give *** a full picture of her financial situation."

¶ 35    The trial court also stated that, even assuming that the disparity in the parties' financial resources was only 2 to1 and not 3 to 1, it was still significant. However, the court continued, it need not address that issue at all, because the grant of the directed finding for respondent was

- 14 -

proper based on petitioner's failure to establish all four of the criteria in section 513(j) of the Act. Therefore, the court denied petitioner's motion to reconsider the judgment.

¶ 36    This timely appeal followed.

¶ 37                                            II. ANALYSIS

¶ 38    On appeal, petitioner raises a variety of overlapping contentions that we have boiled down to two substantive arguments: (1) the MSA required respondent to share in the payment of the children's postsecondary educational expenses; and (2) the trial court misapplied section 513(j) of the Act by giving decisive weight to one factor, the financial resources of the children (see 750 ILCS 5/513(j) (West 2022)). We address these arguments in turn.

¶ 39    We set out our general principles of review. Section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2022)) states, in pertinent part:

> "In ruling on the motion [for a directed finding in a non-jury case], the [trial] court shall weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence. If the ruling on the motion is favorable to the defendant, a judgment dismissing the action shall be entered."

¶ 40    Case law establishes the following process for evaluating a motion for a directed finding:

> "A court assesses a motion for directed finding in a two-step process. [Citation.] In the first step, the court determines whether the plaintiff or nonmoving party has presented a *prima facie* case as a matter of law. [Citation.] To demonstrate a *prima facie* case, the nonmoving party must present at least some evidence of every element of the underlying cause of action. [Citation.] If the nonmoving party has failed to meet its burden, the court must grant the motion and enter judgment in favor of the defendant or moving party.

[Citation.] Such a determination presents a question of law, and we review *de novo* the court's ruling, performing the same analysis as the court below. [Citation.]

If, however, the nonmoving party has met its burden of presenting a *prima facie* case, the trial court moves on to the second step. [Citation.] In this step, the court considers all the evidence presented, weighing the evidence, determining the credibility of the witnesses, and making all reasonable inferences arising from the evidence. [Citation.] By weighing the evidence, some of the evidence presented by the nonmoving party may be negated. [Citation.] After weighing all the evidence (with the possible negation of some of it), the court must determine whether there remains sufficient evidence to establish the nonmoving party's *prima facie* case. [Citation.] If sufficient evidence establishing the *prima facie* case remains, the court should deny the motion for directed finding and proceed with the trial; if the *prima facie* case no longer can be established, the court should grant the motion and enter judgment in favor of the moving party. [Citation.] The court's ruling on a motion for directed finding granted at the second step is reviewed to determine whether it was against the manifest weight of the evidence." *Reynolds v. Reynolds*, 2025 IL App (2d) 240028, ¶¶ 24-25.[4]

¶ 41 The trial court's comments on petitioner's failure to produce evidence on every relevant factor under section 513 suggest that the court did not advance to the second step of the analysis. However, under either a *de novo* or manifest-weight standard of review, we would affirm.

---

[4]In her opening brief, petitioner repeatedly misstates the standards for granting a motion for a directed *finding* in a nonjury case and the standard of review on appeal; instead, she cites the standards that apply to a grant of a directed *verdict* in a jury trial. See 735 ILCS 5/2-1110 (West 2022); *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). In her reply brief, she corrects the error.

¶ 42    In a postdissolution proceeding under section 513 of the Act, petitioner must establish (1) that the respondent should contribute to the educational expenses of the child and (2) how much the respondent should contribute. *People ex rel. Sussen v. Keller*, 382 Ill. App. 3d 872, 879 (2008).

¶ 43    As the motion for a directed finding involved the construction of a contract, the MSA, the trial court was charged with effectuating the intent of the parties. See *In re Marriage of Kuyk*, 2015 IL App (2d) 140733, ¶ 17. The interpretation of the MSA is a question of law and, thus, our review is *de novo*. *Id.* To the extent that the issues involve the interpretation of section 513 of the Act, our review is also *de novo*. See *Blum v. Koster*, 235 Ill. 2d 21, 44 (2009).

¶ 44    We turn to the first issue on appeal. Petitioner contends that section VI(C) of the MSA required respondent to contribute to the children's educational expenses and that, therefore, the trial court erred in denying her any contribution from him. Petitioner asserts that, by reserving the issue of educational expenses for later judicial determination, the MSA "created an enforceable obligation for *** respondent to contribute to such expenses, with the only remaining question being 'how much?' " (Emphasis omitted.) She supports this interpretation of section VI(C) with a single authority, *In re Marriage of Dieter*, 271 Ill. App. 3d 181, 190 (1995).

¶ 45    We again quote section VI(C) of the MSA:

>    "The parties agree that the court shall decide the issue of the parental contribution for post-high school education, if there is any, and if the parents cannot agree, at the time each child pursues such education, using the appropriate statutory standard as it exists at that time."

¶ 46    We see nothing in this language that obligates respondent to contribute regardless of the facts. The controlling language says only that, if the parties cannot agree on the allocation of the children's expenses, the trial court "*shall decide the issue of the parental contribution* for post-high school education, *** using the appropriate statutory standard as it exists at that time."

(Emphasis added.) This language plainly leaves open the entire "issue" of parental obligation, which includes whether the respondent spouse ought to pay anything at all. This reservation is consistent with section 513(a) of the Act, under which the trial court "may award sums of money out of the property and income of *either* or both parties." (Emphasis added.) 750 ILCS 5/513(a) (West 2022).

¶ 47    The open-ended language of the parties' MSA contrasts sharply with the MSA language that was applied in cases where the appellate court held that the MSA created a *per se* obligation of the respondent parent to contribute. In *In re Former Marriage of Donnelly*, 2015 IL App (1st) 142619, ¶ 4, the MSA stated that " '*the parties *** shall pay* for a trade school, vocational school, [or] college or university education for the children.' " (Emphasis added.) The appellate court held that this language expressly created an obligation on the part of both parties and did not reserve the issue of who should pay. *Id.* ¶ 23.

¶ 48    In *In re Marriage of Spircoff*, 2011 IL App (1st) 103189, ¶ 6, the parties' MSA stated that " '*[e]ach of the parties shall* contribute to the trade school or college and professional school education expenses of their child in accordance with Section 513 [of the Act].' " (Emphasis added.) The appellate court held that, under this language, "the obligation of the parties for educational expenses was clearly and affirmatively stated and was not expressly reserved." *Id.* ¶ 17. We recognize that *Spircoff* is factually dissimilar from this case in that it involved an action brought by the parties' son as a third-party beneficiary of the MSA. *Id.* ¶ 1. Nonetheless, the case is relevant for its distinction between MSA language that binds a parent in advance to contribute to the child's educational expenses and MSA language that does not do so but reserves the matter for future determination.

¶ 49    This case is dissimilar to both *Donnelly* and *Spircoff* as to the relevant MSA language. Had petitioner and respondent intended to obligate either or both of them in advance to contribute to their children's educational expenses, their MSA could have plainly said so, as did the MSAs in *Donnelly* and *Spircoff*.

¶ 50    *Dieter* does not aid petitioner. There, in a postdissolution proceeding, the respondent father was held in contempt of court for failing to adhere to the parties' MSA and pay all the college expenses of the parties' son, who attended school in North Dakota. *Dieter*, 271 Ill. App. 3d at 182, 187. The trial court ordered the respondent to pay the son's prospective expenses as well as past expenses he failed to pay. *Id.* at 187-88. On appeal, the respondent argued that the trial court erred in refusing to deduct from the award any amount that the son could have contributed or saved, such as by applying for in-state tuition. *Id.* at 190-91. The appellate court affirmed. It noted that the MSA stated, " '[Respondent] *shall pay* for the college school education of [the son].' " (Emphasis added.) *Id.* at 183. The court concluded that this language meant that the respondent "was under a legal duty to provide for the maximum amount of his child's future education expenses." *Id.* at 190.

¶ 51    Like the MSA language in *Donnelly* and *Spircoff*, the MSA language in *Dieter* stands in sharp contrast to that here. Under the plain language of the MSA here, the parties left for judicial determination whether either or both of them would be obligated to pay the children's postsecondary education costs. Thus, per the MSA, it was appropriate for the trial court to hear and determine contribution, and likewise to determine that petitioner presented insufficient evidence to establish a claim for contribution under the Act. Accordingly, we reject petitioner's contention that the trial court erred as a matter of law by declining to order contribution.

¶ 52    We turn to petitioner's second issue. She argues that the trial court based its ruling solely on the lack of evidence on the third section 513(j) factor, the financial resources of the children. We note two crucial considerations. First, petitioner bore the burden not only to prove (1) whether respondent should contribute anything at all but also (2) *how much* he should contribute. See *Keller*, 382 Ill. App. 3d at 879. The MSA left both issues open.

¶ 53    Second, the trial court did not base its directed finding on the evidence (or lack thereof) pertaining to just one factor under section 513(j). To be sure, there was a dearth of evidence as to the children's financial resources. Cassandra testified that she worked part-time, but she provided no specifics. As for Jennifer (who did not testify), petitioner simply submitted statements from the First Horizon account held jointly by petitioner and Jennifer. These statements showed that, between August 16, 2023, and January 17, 2024, and between June 18, 2024, and August 16, 2024, approximately $1,667 was deposited from Cutco/Vector. However, not until the hearing on the motion to reconsider the directed finding did petitioner testify that Cutco/Vector was Jennifer's employer (although petitioner introduced no pay stubs to establish this). Therefore, in entering the directed finding, the trial court was correct in determining that the record (including the First Horizon statements) did not show any income earned by Jennifer. There were various other deposits on the First Horizon statements—*e.g.*, $1,200 on December 28, 2023, and $5,155 on February 23, 2024—but the sources are not identified on the statements themselves or elsewhere in the record. These deposits from unknown sources only added to the murkiness of the record before the trial court.

¶ 54    Although the paucity of evidence as to the children's financial resources might have been enough to warrant the directed finding, the trial court stated additional valid grounds for its judgment. We note that even if the trial court's explanation of its ruling did not explicitly mention

a particular factor, we would not presume that the court did not consider that factor. See *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶¶ 44-45; *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 424 (1991). We consider all pertinent evidence in determining whether the trial court properly concluded that petitioner did not establish a *prima facie* case for contribution.

¶ 55 As the trial court stated, it received relatively little evidence of how much petitioner *actually paid* for the children's education. Petitioner introduced extensive evidence of small purchases that she made on behalf of the children. However, there was little or no evidence of how much she paid for their tuition, housing, or other larger expenses. She testified to sums that she claimed to have paid, but she admitted that she could not point to any documentation. She introduced tuition statements reflecting fairly significant payments, but the sources of the payments were not indicated. Neither petitioner's credit card statements nor bank statements reveal expenditures for tuition or other education expenses. Thus, we have virtually no evidence about who paid the predominant expenses, such as tuition and housing, beyond both children receiving scholarships. Moreover, petitioner made no effort to distinguish payments made before the petition was filed (in January 2023) from those made after. See 750 ILCS 5/513(k) (West 2022) ("The establishment of an obligation to pay under this Section is retroactive only to the date of filing a petition."). Regardless, without petitioner having established what was paid, or how it was paid, we agree with the trial court that petitioner failed to establish a *prima facie* case for "how much" respondent should contribute. See *Keller*, 382 Ill. App. 3d at 879.

¶ 56                                III. CONCLUSION

¶ 57 In sum, the trial court identified multiple deficiencies in petitioner's claim for contribution that warranted a directed finding in favor of respondent, and we find no error in its conclusions. Accordingly, for the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 58 Affirmed.